[Civ. No. 7757. First Appellate District, Division Two.—June 13, 1931.]

DONNETTE HEPNER, Respondent, v. LIBBY, McNEILL & LIBBY (a Corporation) et al., Appellants.

J. Hampton Hoge, Thomas L. Smart and A. Dal Thomson for Appellants.

Ford & Johnson and Fletcher A. Cutler for Respondent.

SPENCE, J.—In this action to recover for personal injuries, the jury brought in a verdict in favor of the plaintiff for the sum of $40,000. Upon motion for new trial, plaintiff consented to a reduction of the judgment to the sum of $27,500. The motion for a new trial was thereupon denied and defendants appeal from the judgment in the reduced amount.

The accident happened between 8 and 9 o'clock on the evening of June 19, 1928, on the main highway between Tracy and Livermore at about the point where a road known as the Byron road intersects the main highway.

Plaintiff was riding as a guest in a Nash automobile driven by a Mr. McCormick on a trip from Fresno to Oakland. The main highway near the point of collision runs in a northwesterly direction and has a concrete surface twenty feet in width. At the point of intersection of the main highway and the Byron road, the main highway curves to the left and continues in a westerly direction toward Livermore. In approaching this intersection from the direction of Tracy, one may continue on the Byron road without changing his course by leaving the main highway at the junction of the roads where the main highway starts to curve. The Byron road also runs in a general northwesterly direction and has an oil and gravel surface fifteen feet in width. As the Nash car was approaching this intersection from the direction of Tracy, defendants' truck was traveling toward Tracy along the Byron road. The two vehicles collided either at or a short distance toward Tracy from the junctions of these roads. After the collision the Nash was standing on its wheels after turning completely over. Its position was either entirely off or almost entirely off the highway on the north side facing toward the highway. The truck was laying on its right side across the paved portion of the highway. The cars were not far apart, and although the estimates varied, most of the witnesses testified that the distance between them was ten or fifteen feet. The damage to the truck was at its front left corner and the Nash car was badly damaged at its front left corner and along the left side. Immediately following the collision the Nash caught fire and some of plaintiff's most serious injuries were caused by the flames. Mr. McCormick, the driver of the Nash, died as a result of his injuries.

On this appeal it is contended that the evidence is insufficient to justify the verdict in that no negligence on the part of appellants was shown. In our opinion this contention cannot be sustained. It is not claimed on this appeal that respondent is chargeable with negligence nor is it claimed that appellants would be absolved from liability merely by showing that the driver of the Nash car was also negligent. Appellants state, however, that respondent's proof went no further than to show that an accident happened and from this premise appellants argue that respond-

ent is not entitled to recover as the doctrine of *res ipsa loquitur* is not applicable to a collision between two automobiles. If the record justified appellants' premise, we could agree with the conclusion, but the evidence went much further than to merely show the happening of the accident and was sufficient to sustain the implied findings of the jury.

Respondent testified that the Nash car in which she was riding had been traveling along the main highway at about thirty-five miles per hour until reaching a sign indicating the curve at which time the car was slowed down to about twenty-five miles per hour; that she saw the lights coming from the Byron road and recalled an effort upon the part of the deceased driver of the Nash to apply the brakes; that the accident happened very quickly right at the start of the curve and that the Nash was driven along the right-hand side of the highway at all times. The witness Kelly, who was at the Standard Oil station on the Byron road near the scene, testified that he saw "the flash of the truck going by" in approaching the intersection and that its speed was about thirty or thirty-five miles per hour. Counsel for appellants insist that this witness withdrew this statement and admitted on cross-examination that he did not see the truck. We do not believe that the testimony referred to necessarily requires this construction. On both direct and cross-examination the witness stated that he saw the truck and was able to form an estimate of its speed. After again testifying on cross-examination that he saw the truck going by at thirty or thirty-five miles an hour, he was asked, "You are certain, in this lighted room—in this room with a light in it—you looked outside through the window at 8:30 at night and were able to observe the *speed* of the truck?" He answered, "Well, not exactly; it is usual that it is going over thirty miles though." Thereafter no further questions were asked of the witness concerning his observation of the truck or its speed. Counsel construe this answer to be an admission on the part of the witness that he did not observe the truck and therefore could not give any estimate of its speed. A reading of the question shows that the answer is equally susceptible to the construction that the witness could not exactly determine the *speed* of the truck or in other words that

he could not estimate the *speed* with accuracy. This may be precisely what the witness meant by his answer for this is obviously the case whenever a person has but a fleeting glance at a rapidly moving object as it passes. It may well be argued that the answer given had some bearing on the weight to be given to the witness' testimony relating to speed, but it cannot be said that the witness withdrew his statement or admitted that he did not see the truck contended by counsel. One of appellants' witnesses who was riding on the truck testified that the truck proceeded along the Byron road toward the intersection at twenty-five or twenty-six miles per hour; that it slowed down to about fifteen miles per hour when they "got down to the intersection" and then "speeded up and started up the road" at "maybe twenty miles an hour or better". This witness had previously signed a written statement which was admitted in evidence stating, "As we entered the intersection, we were traveling about twenty miles per hour". The driver of the truck testified to similar or slightly slower speeds, but the uncontradicted evidence showed that the truck did not stop before entering upon the main highway, but merely slackened its speed to some extent. Diagrams and photographs, including an aeroplane view of the intersection, were introduced in evidence and considerable testimony was offered by both sides relating to the position and condition of the cars after the accident, together with the location of the broken glass upon the highway. Counsel for appellant argue that even conceding that the Nash finally stopped off its own right side of the road, that the truck came to rest stretched across the road, and that the major portion of the glass was on the north side of the road, such facts can prove nothing save that a collision occurred. We are not required to pass upon the probative value of such testimony standing alone. There was abundant testimony in the present case regarding the manner in which the Nash and the truck approached and collided and the evidence of the position and condition of the cars and the location of the broken glass after the accident was helpful in throwing light upon the probability or improbability of the testimony of the various witnesses. It was appellants' theory that the truck had crossed the main highway and proceeded some little distance when the

Nash was negligently driven over to the left side of the highway striking the truck. It was respondent's theory that the collision occurred at the junction of the two roads and that the truck had been negligently driven on to the main highway from the Byron road and directly into the path of the Nash as the Nash was making the curve on the main highway on its own right side of the road. There was evidence to sustain either theory and in fact there was ample evidence to sustain a finding that either or both of the drivers were negligent. They were in full view of each other as they traveled toward one another in approaching the intersection. Considering the evidence relating to the relative speeds of the cars and the relative distances of the cars from the intersection at various times in their approach, the jury could have properly concluded that ordinary care upon the part of either driver would have avoided the accident and that the concurrent negligence of both drivers proximately caused it. It is elemental under these circumstances, that a judgment against one of the drivers will not be disturbed merely because the evidence would also sustain a finding of negligence on the part of the other driver.

Appellants' further contention that the judgment in the reduced amount is grossly excessive is without merit. Respondent was a young, unmarried woman of the age of twenty-four years, regularly employed and earning well in excess of $100 per month in salary and commissions. She suffered most severe, painful and permanent injuries. In addition to the second and third degree burns on her legs, she suffered injuries about her head, concussion of the brain, a fractured rib and a hernia. We will not attempt to describe in detail these injuries and their treatment as shown by the testimony. The burning of the legs was sufficient to seriously impair, if not entirely destroy, the sensatory and circulatory system in the region of the burns as well as to cause respondent's limbs to be unsightly. It was necessary to give respondent morphine, codeine and verenol over a long period of time to allay the pain. A baked crust formed which was running with pus and became badly infected. The granulations were subsequently scraped off and skin grafting was attempted. Eighty to one hundred scars were left on respondent's thighs where plant grafts had been taken for the purpose

of skin grafting. Respondent ran a high temperature and was delirious at times. Blood transfusions were resorted to as late as two months after the accident. The skin grafting was only partially if at all successful. Running ulcers and keloid formations resulted on respondent's legs, some of which were present at the time of the trial in April, 1930. Much of the tissue which would apparently heal would then dry and crack. Respondent could do very little walking because of the pain and the swelling of her feet and ankles that resulted. Respondent had been under the treatment of various physicians up to the time of the trial and had spent considerable time in various hospitals. To complete the skin graft, she would have to undergo another operation requiring hospitalization for a month or six weeks. An operation for the hernia would require an additional three weeks in the hospital. The nervous shock accompanying the injuries and treatment had resulted in neurosis and respondent had been totally disabled up to the time of the trial. The testimony showed that there would probably be some improvement in this condition after the further operations had been performed and a few years had elapsed. In the opinion of the expert witnesses there would be not only permanent physical scars but there would be a "permanent scar on her mental life". On the trial respondent's limbs were exhibited to the jury and the scars on her forehead and across the bridge of her nose were also visible to them. In short the record contains abundant evidence showing the extensive and permanent injuries received, the extreme pain suffered over a long period of time, the prolonged and only partially successful treatment, the unsightly and abnormal condition of respondent's limbs at the time of the trial, the necessity for further operations and treatment, the permanent scars, the loss of sensatory and circulatory functions in the burned areas, the serious effect upon respondent's nervous system, the loss of wages, the impairment of earning capacity and the large amount of special damage such as doctors' bills and hospital bills incurred prior to the trial as well as the further bills to be incurred in the future. Under the evidence, it cannot be said that the judgment is excessive.

In connection with their attack upon the amount of the judgment appellants make one further claim. The

record discloses a "Consent to Reduction of Judgment" signed by respondent and her counsel. This was filed on June 25, 1930, and on the same day the trial court entered its order reciting this consent and denying the motion for new trial. Appellants contend that in the reduction of the amount of the verdict through means of a stipulation, the trial court must fix "the lowest possible sum which another jury would award or else grant a new trial" and that any departure from this rule constitutes prejudicial error. Counsel cite no authority in this jurisdiction tending in any way to support this contention. The procedure followed by the trial court in denying the motion for new trial after the filing of the consent to reduction was proper (*Bentley* v. *Hurlburt,* 153 Cal. 796 [96 Pac. 890]), and it is not to be assumed that the trial court concluded that the original verdict was the product of passion or prejudice. (*Standiford* v. *Cantrell,* 87 Cal. App. 736 [262 Pac. 800].) The judgment in the reduced amount is not excessive and in our opinion it should not be disturbed.

Appellants further contend that the trial court erred in the instructions given to the jury. The first instruction complained of consisted of the reading of subdivision a and subdivision b (2) of section 113 of the California Vehicle Act relating to the general restrictions on speed and the lawful speed at an obstructed intersection. There was no error in giving this instruction as there was evidence relating to the speed of the truck and there was also evidence of the heavy growth of trees in the V formed by the Byron road and the curve on the main highway.

Appellants further complain of an instruction reading, "The operator of an automobile is not necessarily exempt from liability for injuries to other persons occurring in a public highway by showing simply that at the time of the accident he was running at a rate of speed allowed by law. He still remains bound to anticipate that he may meet other automobiles operated on the highway, and he must, in order to avoid a charge of negligence, keep a proper lookout and keep his automobile under such control as will enable him to avoid a collision with another automobile which is operated with reasonable care, and, if the situation requires, he must slow up and if reasonably necessary, stop." No exception is taken to the general rule set

forth but it is claimed that by reason of the language employed, the instruction imposed "a standard of care applicable to the defendants alone". It is a sufficient answer to point out that the language employed did not limit the application of the rule to the conduct of the driver of the truck and that the general standard of care imposed was equally applicable to the conduct of both drivers.

We find no error in the record. The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 13, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 10, 1931.