[L.A. No. 31736. Jan. 9, 1984.]

DUANE SCHELBAUER, Plaintiff and Respondent, v.
BUTLER MANUFACTURING COMPANY, Defendant and Appellant.

## COUNSEL

Pickell & Knudson, Robert J. Pickell and Arthur W. Vance for Defendant and Appellant.

Robert M. Holstein, Jr., Leonardini & Fathy and Richard G. Fathy for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—This personal injury lawsuit presents two issues for resolution. First, is a postaccident warning alerting consumers to take safety precautions in using a product admissible in a strict liability action against a manufacturer? Second, may a trial court utilize a remittitur to reapportion liability among the parties if it concludes that the jury's apportionment is not supported by the evidence and that the damage award is excessive only to the extent that it reflects an improper apportionment?

### I.

The facts are not in dispute. At the time of the accident, respondent, Duane Schelbauer, was a journeyman ironworker. He was employed by Pre-

Fab Erectors (Pre-Fab) which was constructing an addition onto an existing building. Appellant, Butler Manufacturing Company (Butler), designed, manufactured, and distributed the roofing panels which were used for the addition.

When Schelbauer arrived at the job site, the only construction left to be done on the addition was the roof. The job entailed fastening preformed roofing panels onto underlying structural components called purlins. The roofing panels were covered with a protective oil coating to prevent rusting and corrosion during shipping and storage.

The oil coating was originally applied by Bethlehem Steel Corporation which supplied the steel rolls to Butler. During the rolling and forming process, Butler often removed oil from steel surfaces which were excessively oiled and added oil to panels which were insufficiently coated. Butler's intention was that the panels leave the factory and arrive at the construction sites with a uniform oil coating.

Butler did not employ an inspector to examine the panels for excessive oil nor did it include any warning in its dealer information materials of the danger associated with possible oil excesses. Prior to Schelbauer's accident, Butler had received no complaints of any accident occurring as a result of any excess oil or slippery condition of the roofing panels.

Schelbauer had not previously laid roofing which required fastening panels by clips. When he first reported to the work site on November 4, 1977, he received no specific instructions as to the proper method for fastening the roofing panels. Instead, he was simply directed by Pre-Fab's foreman to "fall in" with the work crew as a fastener operator. Schelbauer watched one of his fellow workers and learned how the clips were placed on the purlins at the end of each panel to keep the panels aligned as they were being fastened. In fastening the clips onto the purlins, Schelbauer would place his left foot on a purlin and his right foot on a panel which had already been fastened. He would then bend at the waist and hold a clip in his left hand while fastening it with a screw gun which he held in his right hand.

Although the roofing was being laid on a flat surface, it was 25 feet above the ground. Schelbauer and his fellow workers were aware that the protective oil coating on the panels made them slippery and difficult to walk on. The only precaution which Schelbauer or any of the other fastener operators took while they were laying the roofing materials was to walk slowly and carefully on the panels.

Schelbauer's accident occurred during his third day on the job. At the time, he was clip-fastening panels onto the partially completed roof. His right foot, which he had placed behind him on an already fastened panel, slipped. He tried to grab the purlin on which he was standing but his glove was oily and he was unable to grip it. Schelbauer fell off the roof and fractured both his right heel and his back.

Schelbauer's injuries required 12 days of hospitalization and 8 months of recuperation at home, first in bed, then in a wheelchair. Subsequently, he was retrained as a building inspector and eventually returned to work 14 months after his accident. He experienced continuing problems from the injuries and four months later left his job to undergo surgery on his foot. Following the surgery, he wore a cast and participated in recuperative therapy. He was then rehospitalized for further treatment of his back. At the time of trial, he had not yet returned to work but was being retrained as a draftsman.

On March 14, 1978, Schelbauer filed a complaint against the general contractor, the owner of the building, Butler and various Does. The complaint included causes of action against Butler for breach of warranty, negligence, and strict liability in tort for a product defect. By July 1980, the actions against all defendants other than Butler had been dismissed.

Schelbauer's action against Butler was tried before a jury beginning in November of 1980. During the trial, Schelbauer introduced into evidence a copy of Butler's 1978 dealer information literature in which a warning had been added after Schelbauer's accident.[1]

On December 14, 1980, the case was submitted to the jury on both strict liability and negligence theories. The court instructed the jury that strict liability could be imposed on the manufacturer if its product had either a design or a manufacturing defect which was the proximate cause of the injuries. The jury was also instructed that the manufacturer could be found liable for negligence if it failed to exercise reasonable care in the manufacture or inspection of the product or if it failed to warn of a dangerous

---

[1] The postaccident document on "Care of Building Panels" included the following language: "Occasionally, panels will be shipped that have a heavy oil coating. Reports of heavy oil coatings are rare and usually occur during the warm summer months. It is generally thought this is due to the material being subjected to higher temperatures in transit and at the job site than it is during in-plant storage, resulting in some flowing of the oil after shipment. The oil flowing from the bundles can stain wall panels and/or concrete. Panels should be checked on receipt so that if wiping of panels is necessary, it can be done without disruption of other erection activities as well as avoiding possible wall or concrete staining. *Wiping may be a necessary safety precaution.* . . . [¶] "WARNING: PANELS WITH PROTECTIVE OIL COATINGS ARE SLIPPERY. PROCEED WITH CAUTION. WIPE CLEAN IF NECESSARY."

condition of the product which proximately caused the injuries. The instructions specified that any contributory negligence on the part of Schelbauer or his employer would have the effect of reducing the amount of damages to which Schelbauer was entitled.

The following day, the jury returned its special verdict in Schelbauer's favor. It found that Butler was both strictly and negligently liable for Schelbauer's injuries. It also found that neither Schelbauer nor his employer were contributorily negligent. The jury calculated the total amount of damages suffered by Schelbauer to be $865,000.

A judgment in Schelbauer's favor in the amount of $697,500 (the amount of the jury verdict less the amounts received in settlement from the other defendants) was entered on December 18th. The next day, notice of entry of judgment was mailed to the parties.

On December 31st, Butler filed a notice of intention to move for a new trial. The grounds stated for its motion were excessive damages, insufficiency of the evidence to justify the verdict that neither Schelbauer nor his employer were contributorily negligent, and two errors of law including the court's ruling that evidence of Butler's postaccident warning was admissible.

On February 17, 1981, after a hearing on Butler's motion for a new trial, the trial court issued an order conditionally granting Butler's motion for a new trial. Under this order, the motion would be denied if Schelbauer consented to a 15 percent reduction of his award.[2] The reduction was intended

---

[2]The court's order read, in full, as follows:

"Defendant Butler Manufacturing Company's motion for new trial is hereby granted, but on the condition that if Plaintiff shall serve and file, on or before March 9, 1981, a written consent to a reduction in the amount of damages by $129,750.00 (so that the resulting judgment, exclusive of costs, shall be $735,250.00 rather than the $865,000.00, awarded by the jury), then the motion for new trial is denied.

"This granting of the motion is on the ground of the insufficiency of the evidence to justify the verdict with respect to the issues of Plaintiff's contributory negligence and the negligence of Plaintiff's employer, and also on the ground of excessive damages in the sense (but not otherwise) that if the jury had found contributory negligence on the part of Plaintiff and negligence on the part of Plaintiff's employer (as I believe they should have), then the damages actually awarded to Plaintiff would be less than under the verdict as rendered.

"The foregoing ruling contemplates contributory negligence of at least 5% and negligence of Plaintiff's employer of at least 10%.

"The court's specification of reasons will be filed within ten days."

The day after this order was filed, the trial court issued a "correction" of the remittitur amount specified in the original order. This second order explained that the court's first calculation was incorrect because it was based upon the amount of the jury's verdict and failed to reflect the settlement amounts already paid by the codefendants. This second order did not, however, amend any other aspect of the original order.

On February 27, 1981, the court filed its statement of reasons further elaborating the basis for its order. The statement of reasons provided in relevant part: "The jury found no contributory negligence of the plaintiff and no negligence of plaintiff's employer. But the evi-

to reflect the trial court's determination that Schelbauer was at least 5 percent contributorily negligent and that his employer was at least 10 percent negligent.

On February 25, 1981, Schelbauer filed a written consent to the remittitur, and the court's denial of Butler's motion for a new trial went into effect. This appeal by Butler from both the judgment and the denial of the motion for a new trial followed.

## II.

The first issue to be addressed is whether a postaccident warning is admissible as evidence in a strict liability case under the rule established by this court in *Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986]. Butler contends that because the addition of a warning is not a change in the product itself, *Ault* is inapplicable and the admission of postaccident warning evidence is prohibited by Evidence Code section 1151.[3] Schelbauer argues that the *Ault* rule should apply to postaccident warnings. According to Schelbauer, such a warning is as much an "improvement" in a defective product as is a change in the product itself. Thus, he contends, the rule applied in the two situations should be the same.

In *Ault, supra,* 13 Cal.3d at page 118, this court held that the exclusionary rule of section 1151 does not apply in strict liability cases. Butler is correct

---

dence shows that plaintiff was aware of the fact that the roof panels were slippery, that other employees had fallen on them during the course of this work, and even that the condition of these particular panels had been discussed among the employees. In my view, the continued work on the roof under these circumstances, and without special safety devices such as restraining belts or platforms, involved a lack of due care on the part of plaintiff's employer with respect to the safety of all employees assigned to the roof installation. The facts show an unreasonable acceptance of an apparent hazard such as is now treated in California as a form of contributory negligence rather than under the separate doctrine of assumption of risk. (See *LI* v. *YELLOW CAB CO.,* 13 C3d 804, 829.)

". . . I am satisfied that the jury clearly should have found contributory negligence, as well as negligence of the employer, and also that such negligence of plaintiff and negligence of the employer were proximate causes of plaintiff's injuries. The jury clearly should have apportioned fault among plaintiff, the employer and the defendant Butler Manufacturing Co.; it was unreasonable to assign all fault to Butler alone.

". . . In such a case it is possible to say, therefore, that the jury's error has had the effect of increasing damages beyond the amount which would have resulted from the verdict if that error had not been made. For this reason, it was pointed out in the order granting the motion for a new trial that excessive damages was one of the grounds, but only in the sense that the error with respect to contributory negligence and the employer's negligence affected the amount of the damages."

[3]Section 1151 provides: "When, after occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event."

All further references to section 1151 refer to this Evidence Code provision.

that *Ault* dealt with the admissibility of evidence relating to a postaccident change in the product itself. Nonetheless, this court's reasoning in *Ault* is as applicable to a postaccident warning in the context of a strict liability action as it is to a postaccident change in the manufacture or design of a product.

■ As this court explained in *Ault,* the purpose of section 1151's exclusionary rule is to avoid deterring individual tortfeasors from making improvements or repairs after an accident has occurred. While section 1151 may serve this function in typical negligence actions, it *"plays no comparable role in the products liability field."* (*Ault, supra,* 13 Cal.3d at p. 119, italics added.) "When the context is transformed from a typical negligence setting to the modern products liability field, . . . the 'public policy' assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule of section 1151 does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field." (*Id.,* at p. 120.)

In addition, as this court noted in *Ault,* the application of the exclusionary rule in the strict liability context would be contrary to the public policy of encouraging distributors of mass-produced goods to market safer products. (*Ibid.,* citing Note, *Products Liability and Evidence of Subsequent Repairs* (1972) Duke L. J. 837, 845-852.) Moreover, given the purpose of section 1151 and the difference between negligence and products liability actions, the express limitation of the section to causes of action for "negligence" or "culpable conduct" must have been deliberate. (*Id.,* at p. 121.) Therefore, this court "decline[d] to judicially extend the application of the section to litigation founded upon [the strict liability] theory." (*Id.,* at p. 118.)

The rule adopted by this court in *Ault* was applied in *Burke* v. *Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768 to allow the admission of a postaccident warning in a strict liability action. In *Burke,* the plaintiff brought an action for injuries sustained when a plastic cork shot out of a champagne bottle manufactured by the defendant, striking and shattering plaintiff's eye-

glasses. The case proceeded to trial on the theory that the manufacturer was strictly liable for the defective design of the product.

The plaintiff in *Burke* sought to introduce evidence that four years after her accident, defendant had placed a warning on its bottles which cautioned consumers to point the cork away from people when opening. The trial court had ruled that evidence of the subsequent warning was not inadmissible under section 1151. On appeal, the reviewing court agreed with the trial court's application of the *Ault* rule to a postaccident warning in the strict liability context. "As negligence or culpability is not a necessary ingredient in an action based upon strict liability against a manufacturer, the exclusionary rule of section 1151 does not apply to that field. (*Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 at pp. 117-121 . . . .)" (*Burke, supra,* 86 Cal.App.3d at pp. 771-772, fn. 2.)

In *Robbins* v. *Farmers Union Grain Terminal Ass'n* (8th Cir. 1977) 552 F.2d 788, the Eighth Circuit reached the same conclusion with respect to rule 407 of the Federal Rules of Evidence.[4] In *Robbins,* the plaintiffs had brought a strict liability cause of action for injuries to their cattle allegedly caused by a feed supplement manufactured by defendant. The trial court admitted evidence of cautionary instructions which defendant mailed to its sales personnel after plaintiffs' cattle were injured.

In upholding the trial court's admission of this evidence, the Eighth Circuit reasoned: "We have applied the *Ault* rationale in allowing proof of post-occurrence design modification and to a subsequent remedial instruction, and find no reason to bar its applicability to Rule 407 since Rule 407 is, by its terms, confined to cases involving negligence or other culpable conduct. The doctrine of strict liability by its very nature, does not include these elements. See *Ault* v. *International Harvester Co., supra*; and *Passwaters* v. *General Motors Corp.,* 454 F.2d 1270, 1277-79 (8th Cir. 1972)." (*Robbins, supra,* 552 F.2d at p. 793, fns. omitted; see also *Herndon* v. *Seven Bar Flying Service, Inc.* (10th Cir. 1983) 716 F.2d 1322, 1326-1331; *Oberst* v. *International Harvester Co., Inc.* (7th Cir. 1980) 640 F.2d 863, 868-871 (conc. and dis. opn. of Swygert, J.).)

Several other state courts which have similar rules of evidence precluding admissibility of postaccident warnings to prove negligence or culpable con-

---

[4]Rule 407 provides in relevant part: "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. . . ."

The Advisory Committee's note to rule 407 states that the federal rule is comparable to section 1151. (2 Weinstein & Berger, Weinstein's Evidence (1975) p. 407-3.)

duct have also adopted the reasoning employed by *Ault*. (*Friederichs* v. *Huebner* (1983) 110 Wis.2d 581 [329 N.W.2d 890, 903-905]; *Siruta* v. *Hesston Corp.* (1983) 232 Kan. 654 [659 P.2d 799, 807-809]; *Caldwell* v. *Yamaha Motor Co., Ltd.* (Wyo. 1982) 648 P.2d 519, 523-525; *Caprara* v. *Chrysler Corp.* (1981) 52 N.Y.2d 114 [436 N.Y.S.2d 251, 417 N.E.2d 545, 549-551]; *Sutkowski* v. *Universal Marion Corporation* (1972) 5 Ill.App.3d 313 [281 N.E.2d 749, 752-753], leave to app. den.; *Shaffer* v. *Honeywell, Inc.* (S.D. 1976) 249 N.W.2d 251, 257, fn. 7; *Ginnis* v. *Mapes Hotel Corporation* (1970) 86 Nev. 408 [470 P.2d 135, 139-140, 42 A.L.R.3d 769].)

 The rationale of *Ault* applies as clearly to postaccident warnings as it does to subsequent product repairs or improvements. Accordingly, the exclusionary rule of section 1151 was never intended to preclude admission of postaccident warning evidence in a strict liability action. The trial court's ruling was correct.

## III.

The second issue to be addressed is whether a trial court may use a remittitur in an order for a new trial to reapportion liability among the parties.

 Ordinarily, a trial court has complete discretion in ruling on a motion for a new trial. Its ruling will not be disturbed absent an abuse of discretion. (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]; *Malkasian* v. *Irwin* (1964) 61 Cal.2d 738, 748 [40 Cal.Rptr. 78, 394 P.2d 822]; *Leipert* v. *Honold* (1952) 39 Cal.2d 462, 467 [247 P.2d 324, 29 A.L.R.2d 1185].)

Butler points to Code of Civil Procedure section 662.5[5] which authorizes the use of a remittitur only when it would be proper for the court to grant a new trial on the issue of damages. It contends that the conditional new trial order was granted on the basis of the insufficiency of the evidence to justify the jury's apportionment of liability. Since this was not a proper use of the remittitur, Butler contends, the court abused its discretion. Schelbauer, however, asserts that—independent of the relevant statutory provision—the trial court was merely exercising its inherent power to amend verdicts by means of remittitur.

Section 662.5 specifically states that the procedural device of remittitur is to be utilized *only* when a new trial is warranted solely on the grounds

---

[5]All subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

of excessive damages. Section 662.5 reads in relevant part: "In any civil action where after trial by jury *an order granting a new trial limited to the issue of damages would be proper,* the trial court may in its discretion: . . . . [¶] (b) If the ground for granting a new trial is excessive damages, make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a [remittitur]." (Italics added.)

The statutory requirement that use of remittitur be limited to those cases where jury error is confined to the issue of damages is express and unequivocal. This court has consistently adhered to this interpretation of section 662.5. (See, e.g., *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171], cert. dism., (1983) — U.S. — [75 L.Ed.2d 422, 103 S.Ct. 1167]; *Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311 [74 Cal.Rptr. 534, 449 P.2d 750], cert. den., 395 U.S. 960 [23 L.Ed.2d 746, 89 S.Ct. 2100].)

■ Schelbauer argues that since appellate courts recognized the power of trial courts to use a remittitur before the enactment of section 662.5, trial courts are not bound by the limitation of that section.

It is true that the use of remittiturs predates the enactment of section 662.5. Indeed, in *Hughes* v. *Hearst Publications, Inc.* (1947) 79 Cal.App.2d 703, 704 [180 P.2d 419], the Court of Appeal pointed out that "[t]he power of the trial court, where the judge after reweighing the evidence on motion for new trial determines that the amount of the verdict is too high, to make an order denying a new trial upon the plaintiff's remission of the portion of the award which the trial judge determines to be excessive, is so thoroughly settled in our law by an unbroken line of decisions commencing with the case of *George* v. *Law* [(1851)] 1 Cal. 363, that we consider this court foreclosed from reconsidering that question." (See also *Northern Pacific R.R. Co.* v. *Herbert* (1886) 116 U.S. 642, 646-647 [29 L.Ed. 755, 758, 6 S.Ct. 590]; *Sharp* v. *Automobile Club of So. Cal.* (1964) 225 Cal.App.2d 648, 652 [37 Cal.Rptr. 585]; 5 Witkin, Cal. Procedure (2d ed. 1971) Attack on Judgment in Trial Court, § 105, p. 3685.)

It is also correct that trial courts have traditionally exercised the authority to reduce excessive punitive damage awards, both before the power of remittitur was codified (see, e.g., *Cotton* v. *Hallinan* (1962) 201 Cal.App.2d 415 [20 Cal.Rptr. 40]; *Draper* v. *Hellman Com. T. & S. Bank* (1928) 203 Cal. 26 [263 P.240]) and after the enactment of section 662.5 (see, e.g., *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980]; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757

[174 Cal.Rptr. 348]; *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331 [126 Cal.Rptr. 731]).

What Schelbauer's argument fails to recognize, however, is that even under the common law rule, use of remittiturs was uniformly confined to cases in which an excessive damage award was the *only* error in the jury's verdict. (See, e.g., *Hughes* v. *Hearst Publications, Inc., supra,* 79 Cal.App.2d 703; *Hepner* v. *Libby, McNeill & Libby* (1931) 114 Cal.App. 747 [300 P.830]; *Bentley* v. *Hurlburt* (1908) 153 Cal. 796 [96 P. 890].) If a trial court discovered error in any other aspect of the verdict rendered in the plaintiff's favor, it granted a new trial. (See, e.g., *Brignoli* v. *Seaboard Transportation Co.* (1947) 29 Cal.2d 782, 790-791 [178 P.2d 445] [new trial properly granted where jury had been improperly instructed on a material issue]; *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 11-14 [116 Cal.Rptr. 575] [new trial appropriate where codefendant was improperly questioned about his insurance coverage].) Thus, Schelbauer's correct assertion that section 662.5 merely codified the common law rule actually refutes his position.

Schelbauer contends that since calculating punitive damages necessarily involves an assessment of a defendant's "culpability," the use of a remittitur to reapportion liability is "largely indistinguishable" from the use of a remittitur to reduce excessive punitive damages. However, section 662.5 expressly confines the use of a remittitur to reduce excessive damages and does not authorize its use beyond that limited context. The Legislature has set the boundaries beyond which a jury verdict may not be invaded by the use of a remittitur. This legislative prerogative should be respected.

Therefore, Butler's contention that the trial court erred in its use of the remittitur is correct. ■ A remittitur may not be used to condition a new trial order if a damage award is excessive only because it reflects an improper apportionment of liability. ■ ■■ ■ ■ Accordingly, the trial court's use of remittitur under these circumstances was an abuse of its discretion.[6] The denial of Butler's motion for a new trial cannot be upheld on the basis of Schelbauer's consent to this remittitur.

---

[6]Butler has also challenged the verdict entered pursuant to the remittitur because Schelbauer consented to the remittitur after the court's jurisdictional period had expired. According to section 660, "the power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court . . . ." Butler argues that although the court's conditional order was filed within the statutory period, Schelbauer did not accept the remittitur until after the 60-day period had expired. Consequently, Butler asserts, Schelbauer's consent to the remittitur is void, the condition was not met, and the new trial order must be enforced.

Butler contends that this rule of law is "clear" from *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821 [59 Cal.Rptr. 276, 427 P.2d 988]. In *Jehl,* this court overruled a prior decision

The invalidation of the conditional remittitur does not, however, invalidate the trial court's order. ■ "[A] void condition can have no effect on an otherwise valid order. The condition is simply disregarded and the order stands. [Citations omitted.]" (*Theriot* v. *Superior Court* (1963) 221 Cal.App.2d 174, 181 [34 Cal.Rptr. 381]; accord *Krebs* v. *Los Angeles Ry. Corp.* (1936) 7 Cal.2d 549, 551 [61 P.2d 931]; *Bledsoe* v. *Decrow* (1901) 132 Cal. 312, 314 [64 P. 397].)

■ The only issue which remains to be decided is whether, devoid of the remittitur provision, the trial court's order granting a new trial on all the issues was appropriate. Butler argues that since the trial court did not limit the order granting a new trial if the remittitur were not accepted, a new trial on all the issues is warranted. It further contends that since the trial court found substantial error in one aspect of the jury verdict, retrial

---

and held that additur does not violate the guarantee of a jury trial provided by article I, section 7, of the California Constitution. Butler relies on language in that case which indicates that trial courts must set the last date for a party's acceptance of an additur within the 60-day jurisdictional time limit established by section 660. (*Id.*, at p. 832.)

An argument similar to Butler's was fully evaluated and rejected in *Chodos* v. *Superior Court* (1964) 226 Cal.App.2d 703 [38 Cal.Rptr. 301]. In *Chodos*, the court reasoned that the interpretation now urged by Butler would unnecessarily restrict conditional orders for new trials. (*Id.*, at p. 711.) The Court of Appeal explained that often a trial court's action is delayed for reasons beyond its control and its new trial order is filed within a few days of the expiration of the statutory period. Were the 60-day period also applicable to acceptance of the condition contained in the order, litigants would frequently be left without sufficient time to evaluate the remittitur and comply with its conditions. (*Ibid.*) "This would have the practical result of denying the parties the opportunity to take advantage of what the court believes, after having heard the case, would make for a just disposition of the controversy. . . . These are matters which should be left to the sound discretion of the trial court, just as are the other factors in such conditional orders. If this is done, it will result, in many cases, in the avoidance of lengthy retrials of actions made necessary solely because of sudden-death conditions which do not afford a reasonable time for compliance. The prevention of unnecessary retrials will result in alleviating overburdened trial calendars." (*Id.*, at pp. 711-712.) Consequently, the *Chodos* court held that, absent any legislative mandate to the contrary, trial courts should have discretion to set reasonable time limits for performing conditions in new trial orders even if they extend beyond the 60-day period in which the trial court must rule on the new trial motion. (*Id.*, at p. 712.)

The *Chodos* reasoning was reevaluated and affirmed after *Jehl* in *Alberton* v. *Superior Court* (1968) 265 Cal.App.2d 812 [71 Cal.Rptr. 553]. In *Alberton*, the court concluded that the statement in *Jehl* concerning this issue was dictum and was not intended to overrule *Chodos*. (*Alberton, supra,* at pp. 817-818.) The *Alberton* court discussed both the "legal soundness and the practical desirability" of the *Chodos* rule (*id.*, at p. 816) and reaffirmed it as controlling the time periods allowable for accepting remittiturs.

This court agrees with "the legal soundness and the practical desirability" of the *Chodos* rule. Accordingly, as long as the trial court issues its order on the new trial motion within the 60-day period prescribed by section 660, it may exercise discretion in setting reasonable time limits for the plaintiff to accept a conditional remittitur.

Here, the trial court issued its order conditionally granting Butler's new trial motion within the 60-day limit. By its terms, Schelbauer was given less than three weeks to serve and file his acceptance. This relatively short time period was not unreasonable. Therefore, this challenge to the remittitur must be rejected.

of all the issues is appropriate. Schelbauer, on the other hand, contends that both the evidence presented and the grounds stated by the trial court in its order make it clear that the new trial should be limited to the issue of apportionment of liability.

■ A reviewing court should not modify an order granting a new trial on all issues to one granting a limited new trial "unless such an order should have been made as a matter of law." (*Baxter* v. *Phillips* (1970) 4 Cal.App.3d 610, 617 [84 Cal.Rptr. 609].)

As the court's order explains, the trial court found that there was insufficient evidence to justify the verdict "with respect to the issues of Plaintiff's contributory negligence and the negligence of Plaintiff's employer . . . ." In the trial court's view, the damages were excessive "in the sense (*but not otherwise*)" that they reflected the jury's finding of no negligence on the part of Schelbauer or Pre-Fab. (Italics added.) In its statement of reasons, the court further expressed its opinion that Butler was at least partially liable for Schelbauer's damages by stating that the jury "clearly should have apportioned fault among plaintiff, the employer and the defendant Butler Manufacturing Co. . . . ." The statement of reasons expressly declared that the damages were excessive "only in the sense that the error with respect to contributory negligence and the employer's negligence affected the amount of the damages."

The order clearly indicates that the trial court (1) concurred with the jury's special verdicts that Butler was liable to some extent and that the total damages sustained by Schelbauer were $865,000, and (2) disagreed only with the jury's apportionment of liability.

Upon review of the evidence, there is ample support for the lower court's conclusion that Butler was liable to some extent for Schelbauer's injuries. The record reflects that the metal panels were covered with enough oil to make them slippery, that the method of affixing the panels to the buildings required workers to walk on them, that Butler did not adequately inspect the panels for excessive oil, and that the panels were sold without any warning cautioning consumers as to their dangerousness.

There was also sufficient evidence to support the trial court's determination that both Schelbauer and Pre-Fab were also negligent. In his testimony, Schelbauer admitted that he was fully aware of the thick oil coating on the

panels, their resultant slipperiness, and the likelihood that he might fall. Nonetheless, he took no safety precautions other than walking carefully on the panels. Nor did he request any safety equipment or express to his employer any concern about the danger.

Similarly, the record shows that Pre-Fab had previous experience with the panels and was well aware of the thick oil coating and of the danger of this condition to employees. However, Pre-Fab neither wiped the panels nor employed any safety methods to protect its workers from further accidents. There was testimony that Pre-Fab failed to instruct Schelbauer on a method for fastening the panels to the roof which was safer than the somewhat risky method he learned by imitating fellow workers.

Also, the record supports the jury's special verdict as to the total amount of damages suffered by Schelbauer. The damage award was fully supported by the testimony of Schelbauer's expert witness. The record adequately supports the trial court's determination that the jury properly decided all the issues it addressed with the exception of the apportionment of liability.

There is no reason to subject the parties and the courts to the expense and delay of retrial of those issues on which the jury and the trial court agreed and which are supported by the evidence. ▇ Where, as here, the trial court has reviewed the jury's special verdicts and has properly concluded that the jury's apportionment of damages is erroneous but that the damage award is incorrect only to the extent that it reflects an improper apportionment of liability, the trial court should have limited its new trial order to that issue. Accordingly, the new trial order is modified to limit the new trial to the issue of apportionment of liability.

A similar modification of a lower court order was made in *Sharp* v. *Automobile Club of So. Cal.*, *supra*, 225 Cal.App.2d 648. There, the Court of Appeal reviewed an order granting the defendant's motion for a new trial after the jury returned a verdict for the plaintiff in an action to recover medical expenses under an insurance policy. The trial court's order granting a new trial read: " 'The court is of the opinion that exemplary damages are allowable in this case. However, the court is of the opinion that the exemplary damages are grossly excessive and must have been the result of passion or prejudice. Accordingly, the motion for a new trial is granted [unless the plaintiff consents to a remittitur].' " (*Id.*, at p. 652.) The plaintiff failed to consent to the remittitur and the order granting the new trial became effective.

. Upon review, the Court of Appeal found that evidence in the record supported both the finding that exemplary damages were warranted and the finding that the amount of the jury's award was excessive. (*Id.*, at p. 652.) The court observed, however, that the form of the order granting the new trial was "not clear" since it purported to be based solely upon an insufficiency of the evidence to support the amount of exemplary damages awarded, but did not expressly restrict the new trial to that issue. (*Id.*, at p. 653.) Yet, the court reasoned, the jury had already resolved the questions of whether the defendants had defrauded the plaintiff and whether exemplary damages were appropriate. The jury determinations of both of these issues were supported by substantial evidence and were concurred in by the trial judge. (*Ibid.*) Therefore, the court concluded, "there is no reason for having a second jury determine issues heretofore determined in the first trial." (*Ibid.*)

The court in *Sharp* rejected the defendants' argument that the jury's passion or prejudice in assessing the proper amount of exemplary damages must have permeated the jury's consideration of the issue of whether exemplary damages should be awarded. The court noted that it had the benefit of the trial court's evaluation that this had not been the case and that exemplary damages were appropriate. (*Id.*, at p. 654.) Therefore, the court exercised its power to modify the lower court order to limit the issues on retrial. (*Ibid.*)

Other jurisdictions have also separated damage issues from liability issues for purposes of limiting new trials where retrial of the entire case was not warranted. (*Caldwell* v. *Piggly-Wiggly Madison Co.* (1966) 32 Wis.2d 447 [145 N.W.2d 745, 752]; *State* v. *Kaatz* (Alaska 1977) 572 P.2d 775, 785; *Sitzes* v. *Anchor Motor Freight, Inc.* (W.Va. 1982) 289 S.E.2d 679, 689, fn. 22; *Pappas* v. *Santiago* (1974) 66 N.J. 140 [329 A.2d 337, 338-339]; *Ferbrache* v. *Dillon* (1979) 100 Idaho 317 [597 P.2d 40, 42-43]; Schwartz, Comparative Negligence (1974) § 18.3, pp. 301-305.)

Under these circumstances, it is proper for this court to exercise its authority under section 43[7] and modify the trial court's order to provide for a new trial limited to the issue of the proper apportionment of liability.

## IV.

The order which denied Butler's motion for a new trial on the basis of Schelbauer's consent to the improper remittitur is vacated. The valid order

---

[7]Section 43 provides in relevant part: "The Supreme Court, and the courts of appeal, may affirm, reverse, or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had."

granting a new trial is modified to limit the scope of the new trial to the issue of apportionment of liability among the parties. The trial court properly ruled that the admissibility of evidence of Butler's postaccident warning was not precluded by section 1151. Admissibility of this evidence at any new trial in support of Schelbauer's strict liability cause of action is not barred by section 1151.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**RICHARDSON, J.**\*—While I concur with the majority, I have one caveat to add to my agreement with regard to section II of the opinion. I join in that part of the opinion under authority of *Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986]. However, I am to some degree persuaded by the position of other courts which, in interpreting statutes similar to Evidence Code section 1151, have held that the exclusion of evidence under such provisions should be extended to postaccident corrective measures in strict liability cases. These cases conclude that the policy of encouraging actions to improve products applies equally in product liability and negligence cases, and that relevancy cannot be presumed because in some instances postaccident alterations may be made for reasons wholly unrelated to the cause of the accident in question. (See, e.g., *Cann* v. *Ford Motor Co.* (2d Cir. 1981) 658 F.2d 54, 60; *Werner* v. *Upjohn Co., Inc.* (4th Cir. 1980) 628 F.2d 848, 856-858, cert. den. 449 U.S. 1080 [66 L.Ed.2d 804, 101 S.Ct. 862]; *Haysom* v. *Coleman Lantern Co.* (1978) 89 Wn.2d 474 [573 P.2d 785, 791, 93 A.L.R.3d 86].) However, we are not provided here with any evidence tending to prove or disprove the assumptions upon which our decision in *Ault* was based.

In any event, I wish to emphasize a point implicit in the majority opinion that merely because section 1151 may not bar introduction of evidence regarding postaccident warnings, such evidence is subject to the court's complete discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; see 2 Weinstein & Berger, Weinstein's Evidence (1975) ¶ 407[03] at p. 407-14 & fn. 7 ["The most desirable approach is to treat products liability cases as governed by Rule 403 [analogous to § 352] rather than Rule 407 [analogous to § 1151], thereby giving the judge

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

discretion to admit the evidence of subsequent repairs when relevance exceeds prejudice to the defendant.''].)

On February 7, 1984, the opinion was modified to read as printed above.