[No. B008513. Second Dist., Div. Seven. July 29, 1986.]

ADOLFO AGUAYO, Plaintiff and Appellant, v.
CROMPTON & KNOWLES CORPORATION,
Defendant and Respondent.

**COUNSEL**

Matz, Brody & Albert and Jeffrey A. Matz for Plaintiff and Appellant.

Murchison & Cumming, Friedrich W. Seitz and Richard D. Newman for Defendant and Respondent.

**OPINION**

**ADLER, J.**\*—This appeal arises out of an industrial accident where plaintiff and appellant, Aguayo (Aguayo), suffered injuries on a machine manufactured by defendant, James Hunter Machine Co., a division of Crompton & Knowles (Crompton). The jury returned a verdict in favor of Crompton. Aguayo appeals raising claims relating to the trial court's orders excluding evidence.

Aguayo argues the trial court erred by excluding evidence that design modifications had been made on machines manufactured subsequent to the

---

*Assigned by the Chairperson of the Judicial Council.

machine causing his injuries, and a comment made by the trial court deprived him of a fair trial. We hold that although the evidence of subsequent design changes may have been relevant, its exclusion was not error and the trial court's comments were harmless.

FACTS

In 1964, Crompton sold a garnett machine to West Coast Quilting (West Coast). The machine was assembled by employees of West Coast and installed into its existing garnetting system. In 1973, Crompton sold its James Hunter Machine Co.'s division to the James Hunter Machine Co., a newly formed company entirely separate from the earlier James Hunter Machine Co.

The garnett machine is a large piece of machinery 60 feet long and 6–8 feet high, which consists of a number of cylinders, pulleys and gears. The garnett is one component of an entire system that converts raw fiber into processed welting for furniture padding. The garnett was equipped with covers or guards, which when maintained properly prevent workers from coming in contact with certain moving parts of the machine and prevents dust clogs.

After installation of the garnett in 1964, West Coast made modifications to the existing metal fence that surrounded the perimeter of the system. The purpose of the fence was to keep the operator at a safe distance from the moving parts of the machinery. West Coast also installed warning signs on the outside of the fence, in both English and Spanish as follows: "Danger. Do not clean, do not oil, do not repair the machine while it is functioning." Crompton did not supply any safety fencing or warning signs for its machinery.

Aguayo was employed by West Coast's successor, American Fiber, as a garnett operator. On October 9, 1978, he sustained injuries to his hand as he tried to adjust or clean the garnett while the machinery was in motion.

Aguayo admitted he had been cautioned by his supervisor to stay away from moving parts and not to clean the machinery while it was in operation. He knew it was not his job to repair the machine. Aguayo spoke Spanish and did not understand English.

Aguayo brought suit against Crompton alleging strict liability in tort for design defects, stemming from the absence of adequate safety equipment and failure to warn.

EXCLUDED TESTIMONY

During the course of trial, Aguayo's counsel sought the introduction into evidence of the following:

1. Testimony of plaintiff's expert that he had inspected a garnett machine manufactured 15 years after the machine causing appellant's injuries;

2. Two owners' manuals or handbooks published by the newly formed James Hunter Machine Co.; and

3. A similar owner's manual published by another garnett manufacturer after the manufacture of the machine causing appellant's injuries.

The trial lasted four weeks where both sides adduced voluminous testimony concerning the sufficiency of the design and safety features of the garnett machine. In an effort to prove the machine unsafe, Aguayo called two expert witnesses, Dr. Siegel and Mr. Springer, who each recommended an alternative design, which they believed would have prevented Aguayo's injuries. The alternative system would include a high fence surrounding the entire machine with a key locking gate. The gate would be controlled by an electrical interlock, which would automatically shut off the machine when the gate was opened. Both witnesses testified that the proposed system was both economically and technologically feasible at the time of manufacture in 1964.

Prior to the start of trial, defense counsel had moved to exclude the testimony of plaintiff's experts concerning design modifications. The trial court had deferred ruling on this motion until well into the trial. During the testimony of Dr. Siegel, plaintiff's counsel adduced testimony that Dr. Siegel had inspected another garnett plant, which contained a machine manufactured by Crompton's successor, James Hunter Machine Co., in 1979 or 1980. Counsel then made an offer of proof that the machine inspected by Dr. Siegel and the 1964 version of the machine at West Coast are "substantially identical," except the newer machine was manufactured with the type of alternative safety equipment proposed by plaintiff. The testimony was offered on the issue of design feasibility. The court excluded this testimony on two grounds: (1) lack of relevance, and (2) even conceding some relevance it was excluded under Evidence Code section 352, due to remoteness, therefore making such testimony consumptive of time and the possibility of confusing the jury.

A product is manufactured defectively if it (1) fails to perform as safely as an ordinary consumer would expect when used in an intended or

reasonably foreseeable manner, or (2) if there is a risk of danger inherent in the design which outweighs the benefits of that design. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 435 [143 Cal.Rptr. 225, 573 P.2d 443].) In deciding "whether the benefits of the design outweigh such risks you may consider, among other things, . . . the mechanical feasibility of a safer alternate design at the time of manufacture . . . and the adverse consequences to the product and the consumer that would result from an alternate design." (BAJI No. 9.00.5; *Barker, supra,* 20 Cal.3d at p. 435.) Appellant relied on the second prong of the above test and offered Dr. Siegel's testimony to show that the alternate safety design of the enclosed system with electrical interlocking devices was in fact a feasible system.

 In this action the issue of design feasibility was before the jury. Plaintiff's experts had described how this alternate safety system would operate using technology available at the time of manufacture in 1964. Appellant offered to prove that these same type garnett machines were still being used in 1980, but were now manufactured with the same alternate safety equipment his experts were describing. The fact that such safety equipment was in current use does have a tendency to show it is a feasible and practical system and is therefore relevant.

 However, inquiry does not stop with relevancy where the trial court has invoked the standards set forth in Evidence Code section 352.[1] The trial court is vested with very broad discretion in ruling on the admissibility of evidence. A trial court acts within its discretion when excluding cumulative and time consuming evidence. (Evid. Code, § 352; *Vossler* v. *Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952, 961 [192 Cal.Rptr. 219].) The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon mechanically automatic rules. (*People* v. *Yu* (1983) 143 Cal.App.3d 358, 377 [191 Cal.Rptr. 859].) Moreover, the trial court's ruling will be upset only if there is a clear showing of an abuse of discretion. (*People* v. *Adams* (1980) 101 Cal.App.3d 791, 799 [162 Cal.Rptr. 72]; *People* v. *Kelley* (1977) 75 Cal.App.3d 672, 678 [142 Cal.Rptr. 457].)

 This issue was presented largely upon appellant's offer of proof regarding Dr. Siegel's testimony. "The necessity of a valid offer of proof is a prerequisite to claiming effective error in the erroneous exclusion of evidence." (Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 20.1, p. 460; Evid. Code, § 354.) Here appellant's offer of proof omitted facts

---

[1]Evidence Code 352: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

that would show that the knowledge and technology used to manufacture and design the 1964 machine was the same used to produce the machine inspected by Dr. Siegel. Plaintiff's experts testified only that the technology needed to produce the alternative system was available in 1964. They did not testify that technology used in design and manufacture were the same in 1964 as in 1980. Since 1964 many advances in technology have been made including the expanded use of computers and electronics. Whether the manufacturing process remained unchanged is a serious question.

Inferences arising from garnett machines manufactured 15 years later would depend on the similarity of the manufacturing process and without this significant link, the relevancy of the proposed testimony is weak.

Appellant argues that *Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148] and *Burke* v. *Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768 [150 Cal.Rptr. 419], require the admission of Dr. Siegel's testimony. *Ault* held that evidence of postaccident design changes in products liability cases were not barred by Evidence Code section 1151.[2] The public policy, which would prevent exclusion of evidence of remedial or precautionary measures to prove negligence, does not apply to products liability cases. (*Ault* v. *International Harvester Co., supra,* 13 Cal.3d at p. 121.)

Since *Ault* there have been few California cases dealing with admission of subsequent design changes. There are, however, many cases dealing with admission of subsequent accidents. Accident cases offer a close parallel with design cases and can be offered into evidence of similar issues. In *Simmons* v. *Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341 [133 Cal.Rptr. 42], a subsequent accident at a railroad crossing was admitted to show that the condition of the crossing was in fact dangerous and defective. The *Simmons* court is careful to note that the subsequent accident happened at the same place as the accident in question and under similar conditions. (*Id.,* at p. 365.)

The *Ault* court facing this issue of subsequent accidents, placed limitations on admissibility: "Evidence of other accidents is admissible to prove a defective condition, knowledge, or the cause of an accident, provided that the circumstances of the other accidents are similar and not too remote." (*Ault* v. *International Harvester Co., supra,* 13 Cal.3d at pp. 121-122.)

---

[2]Section 1151 provides: "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event. . . ."

Judge Jefferson also places caveats to admission of subsequent accidents: "Even though evidence of prior or subsequent accidents is relevant because of a sufficient degree of similarity between those accidents and the accident in question and their circumstances, if the probative value of such evidence is outweighed by the danger of confusion of issues or undue prejudice to an adverse party, the trial judge should exclude it by applying Evidence Code § 352." (Jefferson, Cal. Evidence Benchbook, *supra,* § 21.7, p. 574.)

Therefore, the *Ault* decision does not mandate the admission of evidence of subsequent accidents or subsequent design changes, but permits introduction of such evidence subject to the rules of admission applicable to evidence generally.

In *Burke* v. *Almaden Vineyards, Inc., supra,* 86 Cal.App.3d 768, plaintiff had been injured by a champagne cork, and four years later the defendant wine producer had included warning labels on its champagne bottles. In approving the admission of the postaccident warnings, the court noted that during the four-year interval there had been no change in either the processing or packaging of the product, therefore "inferences arising from the fact of the subsequent warning may reasonably be related back to the time of the accident." (*Id.,* at p. 774.) Here in contrast, the evidence showed that garnetting systems can be different, since most systems were assembled by the customer and adapted to his particular needs.

■ Additionally, the jury was presented with extensive testimony of two experts concerning the feasibility of the proposed system. If evidence "is merely cumulative, it may be regarded as of less probative force than if it is the only evidence available to its proponent." (*Ibid.*) The court here acted within its discretion by excluding the proposed testimony of Dr. Siegel.

■ Next, appellant argues that the trial court erred by excluding admission into evidence of two owner's manuals or handbooks published by the James Hunter Machine Co. The 1980 handbook contained an illustration of a garnetting machine with a guarding system similar to the one proposed by appellant and various warnings and notices regarding the safety and care of the machine. The other manual published between 1972-1980 contained similar warnings and notices also found in the 1980 publication. Appellant sought to introduce the above documents for the following reasons: (1) to show feasibility of the proposed alternate design; (2) to demonstrate the original warnings and notices were inadequate; and (3) to rebut the testimony of respondent's experts.

The trial court excluded the above documents on the grounds that they were too remote and that the manuals were published by the newly formed

James Hunter Machine Co., and not the manufacturer of the machine causing appellant's injury.

These manuals were offered essentially for the same purpose as the proposed testimony of Dr. Siegel and suffer from the same evidentiary weakness. There is no evidence to show that the subsequent manufacturer and production were under the same or similar circumstances as the machine causing injury. Appellant is correct in arguing that the lack of continuity of the company producing the two garnett machines would not, taken alone, bar admissibility. However, had appellant's offer of proof included facts showing that the newly formed James Hunter Machine Co. produced its products with the identical or similar technology and methods used by the earlier company, a logical inference could then be made as to any subsequent design defects or modifications. The above evidentiary gaps taken together with the 16 years separating manufacture of the machines, clearly demonstrate the weakness of any inferences drawn from the proposed manuals.

Appellant also argues these manuals were admissible to rebut the testimony of respondent's expert, Dr. Paul Youngdahl. Dr. Youngdahl testified that the Crompton garnetting machine was safe, that the safety guards on the machine were adequate, that the space limitation at West Coast's plant would prevent installation of appellant's proposed alternate safety design, and that the proper placement of the machine was entirely the responsibility of the purchaser.

To rebut the testimony of respondent's expert, the manuals would have to be admitted into evidence. However, appellant has given scant attention to foundational requirements. Appellant never indicated to the trial court how he intended to lay the necessary foundation and authentication of these records, but now argues on appeal that the manuals would come in through his expert witness. Appellant is mistaken. In *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 788-789 [174 Cal.Rptr. 348], the court held, "[w]hile an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible." This rule rests on the rationale that experts may not under the guise of reasons bring before the jury incompetent hearsay evidence. (*People* v. *La Macchia* (1953) 41 Cal.2d 738, 744-745 [264 P.2d 15], overruled on other grounds in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]; *Baily* v. *Kreutzmann* (1904) 141 Cal. 519 [75 P. 104].) Without the proper foundation, these manuals would not have been by themselves admissible evidence and could only be referred to but not admitted. (*Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 704 [200 Cal.Rptr. 870, 677 P.2d 1147].)

Additionally, neither of the offered manuals contain discussion or explanation of external fencing, electrical interlocks or similar safety equipment. In fact, as to the 1980 manual appellant was offering only one page which contained a diagram of the garnett machinery with safety fencing. It is not known whether this safety fencing is supplied by the manufacturer or is merely illustrative material. If the latter be the case, this evidence would then support respondent's argument that safety fencing is not supplied by the manufacturer in this industry.

■ Appellant next argues these manuals are admissible to show the warnings were inadequate. In *Schelbauer* v. *Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 452 [198 Cal.Rptr. 155, 673 P.2d 743], the court held that like postaccident repairs and improvements, postaccident warnings are admissible in product liability actions. ■ The duty owed by a manufacturer is "to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger that would not be readily recognized by the ordinary user." (BAJI No. 9.00.7 (7th ed. 1986); *Finn* v. *G. D. Searle & Co., supra,* 35 Cal.3d 691; *Powell* v. *Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357 [212 Cal.Rptr. 395].)

However, there can be no liability for failure to warn where the instructions or warnings sufficiently alert the user to the possibility of danger. (*Oakes* v. *E.I. DuPont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 649 [77 Cal.Rptr. 709].) Here, there were warning signs displayed on the exterior of the machine and contained the following message in both English and Spanish: "Danger. Do not clean, do not oil, do not repair the machine while it is functioning." Appellant admitted that he had read and understood this sign. He was aware that the machine was dangerous and was not to be cleaned while in operation. Nevertheless, appellant approached the machine with a cleaning implement in his hand. He denied, however, that he was attempting to clean it but only to make an adjustment. Appellant had always made such adjustments in the past when the machine was off. Although appellant's hand was caught 12 inches inside the machine, he could offer no explanation as to how his hand was caught. Testimony from other witnesses showed appellant would have to be reaching into the machine with his arm extended to its full length in order to reach the point where the accident occurred. Furthermore, the adjustment mechanism was located in an area entirely different from where appellant was injured. It appears from the foregoing that appellant was fully aware of the dangers posed by using this machine and was adjusting or cleaning the machine in a manner he knew was dangerous and against instructions.

■ Finally, these manuals are written in English, and would have little relevance to appellant who speaks Spanish and does not understand English.

In any event, appellant was fully aware of the dangers posed by this machine, and the duty to warn was adequately discharged. The court did not abuse its discretion by excluding these two manuals.

Next, appellant argues that the trial court erred by excluding admission of an owner's manual published in 1974 by the manufacturer of another brand of garnett machine. This evidence suffers from the same weaknesses as the other manuals, but in addition, there was no indication or offer of proof as to the similarity of these various machines. There was no error in its exclusion.

Finally, appellant claims error in a single comment of the trial judge made before the jury.[3] Absent exceptional circumstances, comments of the trial judge will not amount to reversible error. This is particularly true where, as here, the jury was admonished to disregard the comment. (*Rendnall v. Thompson* (1952) 108 Cal.App.2d 662, 665 [239 P.2d 693].)

The judgment for respondent is affirmed.

Lillie, P. J., and Johnson, J., concurred.

---

[3]After appellant's counsel made a motion to reopen testimony the court stated: "Counsel, you know it has been three weeks. I think the jury is getting a little tired of hearing some of the areas over and over again. At least I am."