Filed 3/7/14  Laguna v. Dole Food Co. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOSE ANASTACIO ROJAS LAGUNA et al., | B233497 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC312852) |
| v. | |
| DOLE FOOD COMPANY, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Victoria G. Chaney, Judge.  Affirmed.

Steve Condie for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Scott A. Edelman, William E. Thomson, Robert W. Loewen, and Thomas A. Manakides for Defendants and Respondents Dole Food Company, Inc., Dole Fresh Fruit Company, Standard Fruit Company, and Standard Fruit and Steamship Company.

King & Spaulding, Gennaro A. Filice III and Paul R. Johnson; Schirrmeister Diaz-Arrastia Brem and Michael L. Brem for Defendant and Respondent The Dow Chemical Company.

This appeal is from an order granting petitions for writ of error *coram vobis* vacating the judgment and dismissing with prejudice *Tellez v. Dole Food Company, Inc.*, Los Angeles Superior Court case No. BC312852 (*Tellez*). We affirm the trial court's order.

## BACKGROUND

### The parties and their counsel

The instant case is one of three related cases -- *Tellez*, *Mejia*, and *Rivera*[1] -- filed in the Los Angeles County Superior Court. The plaintiffs in all three cases alleged that between 1970 and 1980 they were employed on Dole-contracted Nicaraguan banana farms on which the pesticide dibromochloropropane (DBCP) was applied; that the DBCP was manufactured and sold to defendant Dole Food Company, Inc. (Dole) by defendant The Dow Chemical Company (Dow), and that plaintiffs were rendered sterile as a result of exposure to DBCP.

Counsel of record for the respective plaintiffs in all three cases were Juan J. Dominguez (Dominguez) and attorneys at Miller, Axline & Sawyer (Miller Axline). Dominguez also worked with Nicaraguan attorney Antonio Hernandez Ordeñana (Ordeñana), who operated the *Oficinas Legales Para Los Bananeros* in Nicaragua. Miller Axline represented the plaintiffs in the instant *Tellez* case until June 12, 2009, and the *Mejia* and *Rivera* plaintiffs until June 17, 2009, when its motions to withdraw as counsel were granted. Since approximately July 2009, plaintiffs in the instant *Tellez* case have been represented by Steve Condie (Condie).

### *Tellez* trial and posttrial motions

The parties and the trial court agreed to try the *Tellez* case first, to be followed by *Mejia* and *Rivera*, which were stayed pending the *Tellez* trial. Miller Axline served as plaintiffs' trial counsel in the *Tellez* case. On November 5, 2007, the jury returned a

---

[1] The other two cases are *Mejia v. Dole Food Company, Inc.*, case No. BC340049 (filed Sept. 20, 2005) and *Rivera v. Dole Food Company, Inc.*, case No. BC379820 (filed Oct. 26, 2007).

2

verdict of approximately $3.3 million in compensatory damages in favor of 6 of the 12 *Tellez* plaintiffs. Those six plaintiffs are the appellants in this case.

In November 2007, shortly after the jury returned its verdict, a Nicaraguan resident referred to as "Witness X" approached Dole and said he had evidence that two of the recovering *Tellez* plaintiffs had never worked on a banana farm and had submitted false testimony and documentary evidence. Dole filed a notice of intent to move for a new trial as to those two plaintiffs, and sought a protective order for Witness X, who was concerned that his life would be in danger if his identity became known.

**The *Tellez* protective order**

The trial court issued a protective order on January 17, 2008, limiting Ordeñana's, but not Dominguez's access to Witness X. The *Tellez* protective order prohibited the unauthorized disclosure of Witness X's name, physical description, employment information, or any other information that would enable another person to identify Witness X; Witness X's deposition or declaration, and any transcript, videotape, memorandum, summary, pleading, or other writing or communication that summarized the substance of Witness X's testimony, and all documents concerning Witness X produced to plaintiffs.

**Judgment entered in *Tellez***

Even with the *Tellez* protective order in place, Witness X refused to testify because he feared for his safety and that of his family. Dole nevertheless filed a motion for a new trial and supported the motion with declarations and memoranda of interviews by investigators and attorneys summarizing what Witness X had reported to them about the fraud. The trial court ruled that the supporting evidence was inadmissible hearsay, found Dole had no admissible evidence of fraud, and denied the motion for a new trial. Judgment was entered on October 6, 2008, rendering Dole liable to four plaintiffs -- Julio Cesar Calero Gonzalez, Matilde Jose Lopez Mercado, Carlos Enrique Diaz Artiaga, and Jose Uriel Mendoza Gutierrez. The judgment rendered Dow liable to the same four plaintiffs and to Jose Anastacio Rojas Laguna and Claudio Gonzalez. Dole was found

3

not liable to Gonzalez and was granted a new trial as to Laguna. The judgment was appealed by all parties.

**Evidence of fraud in *Mejia* and *Rivera***

As discovery proceeded in the *Mejia* and *Rivera* cases, Dole uncovered further indications of fraud. For example, during the first day of his deposition, former *Mejia* plaintiff Pablo Emilio Peralta was presented with evidence that he had impregnated several women after he claimed to have become sterile as the result of working on a banana farm. Peralta could not explain this evidence and did not return for the second day of his deposition. His claim was subsequently voluntarily dismissed. *Mejia* plaintiff Francisco Donald Quiñonez testified that to prepare for his deposition he had to "study" from a notebook containing detailed information about his alleged employment at a banana farm, and that during this preparation another person dictated certain information to him that he then wrote down and memorized "like a parrot."

On September 30, 2008, Dole filed an ex parte application to depose three witnesses in Nicaragua who would allegedly verify that certain *Mejia* plaintiffs had never been employed as DBCP applicators on banana farms, that these plaintiffs' documentary evidence was falsified, and that Dominguez and Ordeñana were knowingly and actively involved in the fraud. Dole also sought a protective order to prevent disclosure of the identities of the witnesses and their testimony from Ordeñana, Dominguez, and anyone in Nicaragua.

**The *Mejia* protective order**

On October 6, 2008, the trial court authorized the depositions of three witnesses in *Mejia* and issued a protective order precluding Dominguez and Ordeñana from learning the identities of the witnesses covered by the protective order (referred to collectively as John Doe witnesses) and excluding them from the depositions. The protective order allowed the *Mejia* plaintiffs' other counsel, Miller Axline, access to witness statements, memoranda of interviews from Dole's investigators, and interview notes from Dole's attorneys and allowed Miller Axline to cross-examine the witnesses during deposition.

The *Mejia* protective order allowed Dole to serve deposition notices that withheld the name, address, and telephone number of the deponent and to serve such notices only on attorneys at Miller Axline. The protective order prohibited Miller Axline from forwarding the deposition notices to or discussing them with Dominguez, Ordeñana, or any of the *Mejia* plaintiffs' Nicaraguan counsel or their agents or associates. The protective order further prohibited the unauthorized disclosure of the names of the John Doe witnesses or of any information that would allow another person to identify the John Doe witnesses, any transcript, videotape, memorandum, summary, pleading or other writing that described or identified the John Doe witnesses or their testimony or anticipated testimony, and any documents concerning the John Doe witnesses produced to the *Mejia* plaintiffs.

The trial court reviewed videotaped depositions of the first three John Doe witnesses and found their testimony supported Dole's claims that the *Mejia* plaintiffs, their Nicaraguan counsel Ordeñana, and Ordeñana's agents and employees in Nicaragua had engaged in and were continuing to engage in fraud on the court. In their respective depositions, John Does 1 through 3 testified that the work certificates purporting to verify the *Mejia* plaintiffs' employment on Dole-contracted banana farms were fraudulent. Many of the certificates were signed in blank by persons who had never worked on a Dole-contracted farm and were issued to individuals who had never worked on banana farms. John Does 2 and 3 had both worked as irrigation captains on two different Dole-contracted banana farms and recalled numerous details about the work crews assigned to apply DBCP at the farms. Both John Doe 2 and John Doe 3 testified that they would recognize their former co-workers at the farms but said they did not recognize the *Mejia* plaintiffs.

The trial court further found the testimony of the three John Doe witnesses provided support for Dole's concern that the witnesses would be subjected to annoyance and oppression if their identities were revealed to anyone in Nicaragua. Certain of the John Doe witnesses testified they were concerned about their safety if Dominguez or Ordeñana were to find out about their testimony.

5

The trial court amended the *Mejia* protective order to allow Dole to take additional John Doe depositions. Dole ultimately took the depositions of 17 John Doe witnesses and pursuant to an agreement with Miller Axline, obtained declarations from 10 additional witnesses. Miller Axline participated in the depositions and cross-examined all of the witnesses except the 10 witnesses from whom sworn declarations were obtained. The trial court gave Miller Axline the opportunity to cross-examine those 10 witnesses by deposition, but Miller Axline declined because deteriorating conditions in Nicaragua raised concerns about the attorneys' own safety as well as that of the witnesses. The parties stipulated that the declarations of the 10 John Doe witnesses would be admissible in light of escalating threats to witness safety.

While the John Doe witnesses were being deposed, the trial court became aware of escalating efforts by Dominguez, Ordeñana, and their agents and employees in Nicaragua to prevent witnesses from cooperating with Dole's investigation. These efforts included instructions in person and by radio broadcast by Ordeñana and Dominguez not to cooperate with or speak to Dole's investigators; threats of violence and other forms of intimidation against anyone who cooperated with Dole, spoke to Dole's investigators or attorneys, or agreed to testify; instructions to the *Mejia* plaintiffs and to the public to commit violence against Dole's investigators and any witnesses who came forward with evidence of fraud; allegations that Dole's attorneys had personally attempted to bribe a witness; and the offer of a $20,000 bounty to anyone who could produce a list identifying the John Doe witnesses.

In the fall of 2008, the trial court on its own motion severed issues in the *Mejia* case and ordered that a Phase I trial be held to determine whether the *Mejia* plaintiffs had worked on banana farms. Soon thereafter, escalating threats of violence against witnesses and investigators caused the trial court to issue, on March 11, 2009, an order to show cause (OSC) as to why *Mejia* and *Rivera* should not be dismissed with prejudice because of fraud, witness tampering, and abuse of process.

6

**Dismissal of *Mejia* and *Rivera***

During the *Mejia* OSC proceedings, Dole presented the testimony of additional John Doe witnesses confirming the existence and extent of fraud by the *Mejia* plaintiffs, Dominguez, and Ordeñana. These witnesses testified that Ordeñana paid former supervisors who had worked on Dole-contracted farms to sign thousands of work certificates in blank that could subsequently be filled in. Some John Doe witnesses testified that they received direction from Ordeñana and Dominguez to recruit potential plaintiffs, whether or not they had worked on banana farms. Potential plaintiffs were then sold training manuals and videotapes containing farm-specific information they could study in order to prepare for subsequent depositions.

Other John Doe witnesses testified about fraudulent laboratory test results, explaining that plaintiffs were instructed to alter their semen samples, and that laboratory technicians were paid to alter test results. The witnesses further testified that potential plaintiffs were instructed to lie about the existence of children born after their alleged DBCP exposure occurred.

Multiple John Doe witnesses also testified about a 2003 meeting in the Montserrat neighborhood of Chinandega, Nicaragua, attended by Nicaraguan and American plaintiffs' attorneys, a Nicaraguan judge, laboratory staff, and others connected with the DBCP litigation in Nicaragua. Among the topics discussed at the meeting were specific instructions to falsify laboratory test results that would verify the purported sterility of the DBCP plaintiffs.

At the conclusion of the *Mejia* OSC hearing, the trial court found "clear and convincing evidence that [the *Mejia*] plaintiffs and their U.S. counsel, Juan J. Dominguez, their Nicaraguan counsel, Antonio Hernandez Ordeñana . . . [had] committed fraud on this Court and on the Defendants." The trial court further found that Dominguez and Ordeñana and their Nicaraguan associates "conspired and colluded with (1) other DBCP plaintiffs' lawyers, . . . (2) Nicaraguan laboratories, and (3) corrupt Nicaraguan judges . . . to manufacture evidence and improperly influence the outcome of DBCP cases pending in Nicaragua and the United States to obtain millions of dollars in

7

judgments that would then be enforced in the U.S. and elsewhere." The trial court further found this fraud "contaminated each and every one of the plaintiffs in the *Tellez* matter." The court issued terminating sanctions and dismissed the plaintiffs' claims in the *Mejia* and *Rivera* cases. Final judgment was entered in those cases on June 26, 2009. Neither the *Mejia* nor the *Rivera* judgments were appealed.

**The instant *coram vobis* proceedings**

Defendants filed their *coram vobis* petitions in this court on May 19, 2009, relying on evidence from *Mejia* and *Rivera* to show that the fraud affecting those cases also affected the instant *Tellez* case and requesting that the *Tellez* judgment be vacated and the case dismissed with prejudice. In the alternative, defendants asked for dismissal pursuant to the court's inherent powers.

On July 7, 2009, this court ruled that defendants had "made a prima facie showing of entitlement to an order to show cause with respect to their claims that the underlying judgment in [*Tellez*] was procured in part by means of fraud." This court further ruled that because the trial court had already conducted an evidentiary hearing in *Mejia* regarding defendant's allegations, it need not conduct a new evidentiary hearing in *Tellez* but could rule on the merits of the petitions upon the filling of a return. We then ordered plaintiffs to "show cause in a return before the superior court why the relief prayed for in the petitions should not be granted."

On August 4, 2009, Chief Justice Ronald George of the California Supreme Court assigned Justice Victoria G. Chaney, who had presided over the *Tellez* trial and the *Mejia* and *Rivera* proceedings as a Los Angeles Superior Court judge, but who had since been elevated to the Court of Appeal, "to sit as a Los Angeles Superior Court judge for the limited purpose of handling the pending Order to Show Cause."

After issuance of the OSC, plaintiffs' counsel, Condie, filed a return challenging the factual and legal findings from *Mejia*. The trial court held a status conference to establish a procedure to provide Condie with access to protected information and then amended the *Tellez* protective order granting Condie access to protected information in *Mejia* as well as information sealed under the protective order issued in *Tellez*.

8

Although our order to show cause did not require a new evidentiary hearing, the trial court presided over a year-long evidentiary process, including at least 17 in person and telephonic hearings to address multiple issues, including plaintiffs' demurrer, discovery requests, requests for continuance and issuance of a protective order, and the parties' objections to evidence, as well as a six-day evidentiary hearing on the OSC during which the parties submitted documentary evidence, deposition testimony of John Doe witnesses, and testimony from two percipient witnesses.

During the evidentiary process, plaintiffs requested and obtained discovery of documents Dole possessed in connection with its fraud investigation, including attorney work product memoranda. Plaintiffs also deposed Dole investigator Francisco Valadez, who had interviewed many of the John Doe witnesses in Nicaragua. They did not seek to depose any other Dole investigator. Dole's expert witness was also deposed and offered an expert opinion that the number of pending Nicaraguan DBCP claims exceeded the number of legitimate DBCP claimants. Plaintiffs also sought to redepose John Doe witnesses 17 and 18. The trial court initially denied that request, but then granted it following the first set of OSC hearings in May 2010. The depositions ultimately did not occur because of threats to witness safety.

During the OSC hearings, Dole presented evidence that the *Tellez* plaintiffs were part of the same fraudulent scheme that had resulted in the *Mejia* and *Rivera* dismissals. Of the six *Tellez* plaintiffs whose claims were tried, two confirmed they had been recruited by Dominguez's office, four submitted work certificates signed by individuals who had not worked on Dole-contracted farms or who were paid to sign certificates in blank, and five produced sperm test reports from Nicaraguan laboratories implicated in the *Mejia* fraud.

At the conclusion of the OSC hearings, the trial court issued an oral ruling, and a subsequent 51-page statement of decision setting forth detailed factual findings that the *Tellez* plaintiffs and their counsel had perpetrated fraud on the court by recruiting persons who had never worked on banana farms as would be plaintiffs, coaching plaintiffs to lie about their work on banana farms, submitting false work certificates, falsifying sterility

9

by submitting fraudulent laboratory reports and concealing children fathered by plaintiffs, and interfering with witnesses and investigators by threats, intimidation, and tampering. The trial court specifically found that the John Doe witnesses were credible, that Dole had not bribed witnesses, and that Dole was diligent in coming forward with evidence of fraud.

The trial court then concluded that defendants met all of the requirements necessary for *coram vobis* relief and granted their petitions, vacating the judgment and dismissing the case with prejudice. The trial court denied defendants' request for alternative relief to vacate the judgment pursuant to the court's inherent power to protect the judicial process. This appeal followed.

## DISCUSSION

### I. Applicable law and standard of review

When evidence of extrinsic fraud is discovered during the pendency of an appeal, an appellate court can issue a writ of error *coram vobis* directing the trial court to reconsider its decision in light of the newly discovered evidence. (*Betz v. Pankow* (1993) 16 Cal.App.4th 931, 941.)[2] The purpose of the writ "'is to secure relief, where no other remedy exists, from a judgment rendered while there existed some fact which would have prevented its rendition if the trial court had known it and which, through no negligence or fault of the defendant, was not then known to the court' [citation]." (*People v. Kim* (2009) 45 Cal.4th 1078, 1091.) The effect of the writ is to remand the case to the trial court for the purpose of reopening the judgment to consider the new evidence. (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295-1296 (*Rachel M.*).)

A writ of error *coram vobis* is a "drastic remedy" that will be issued only if the following requirements are satisfied: (1) no other remedy is available to consider the new evidence; (2) the new evidence would compel or make probable a different result in the

---

[2]    "The common law writ of error *coram nobis* is used to secure relief, in the same court in which a judgment was entered, from an error of fact alleged to have occurred at trial . . . .  Technically, when the petition is addressed to the trial court it is *coram nobis*, and when addressed to an appellate court it is *coram vobis*. [Citations.]" (*Betz v. Pankow, supra*, 16 Cal.App.4th at p. 941, fn. 5.)

10

trial court; (3) the petitioner acted diligently, but through no fault of its own, did not have the evidence at the time of trial; (4) the evidence concerns an issue not adjudicated at trial; and (5) the evidence was not presented earlier because of extrinsic fraud. (*Rachel M., supra*, 113 Cal.App.4th at p. 1296.)

A trial court's factual findings in a *coram vobis* proceeding are reviewed under the substantial evidence standard. (See *People v. Savin* (1940) 37 Cal.App.2d 105, 108 [appellate court cannot reverse trial court's order in *coram nobis* proceeding "if there is substantial evidence or a reasonable inference to be drawn from it which supports the order"].) A trial court's ruling on a petition for writ of error *coram vobis* is reviewed for abuse of discretion. (See *People v. Kim, supra*, 45 Cal.4th at pp. 1095-1096.)

## II.  Propriety of the protective orders issued in *Mejia* and in the instant *Tellez* case

Plaintiffs contend the protective orders issued by the trial court in *Mejia* and in the instant case were an abuse of discretion because those orders allowed defendants to submit false claims and false testimony by John Doe witnesses that then became the basis for erroneous factual findings by the trial court.[3] Plaintiffs further contend the protective orders violated their due process right to a fair trial by precluding their counsel from investigating and challenging the veracity of Witness X and of the John Doe witnesses.

We do not address plaintiffs' challenge to the protective order issued in *Mejia*, a case in which they were not parties, in which final judgment was entered, and from which no appeal was taken. Our review is limited to the protective order issued in the instant *Tellez* case.

---

[3]     Although plaintiffs frame their argument as a challenge to "the process authorized by the trial court in *Mejia* and [in] this case," that challenge is expressly directed at "the [trial] court's orders imposing secrecy on all of the John Doe witnesses' identities and testimony, limiting which counsel opposed to defendants could learn about them and expressly limiting what steps could be taken to investigate them" -- in other words, to the terms of the *Mejia* and *Tellez* protective orders.

11

### A. Allegedly erroneous factual findings
#### 1. Discrepancies between *Mejia* and *Tellez* findings

Plaintiffs cite selected oral and written findings made by the trial court in *Mejia* that were not included in the *Tellez* statement of decision as support for their argument that the evidentiary process employed by the trial court allowed the court to make factual findings that were not only erroneous but false. For example, plaintiffs compare the trial court's finding in the *Mejia* statement of decision that "[t]he total number of plaintiffs claiming to have been injured while working on a Nicaraguan banana farm formerly associated with Dole is many times the total number of people who worked on the farms" and the trial court's oral finding in the instant *Tellez* case that "[i]t is not reasonable to conclude that 14,000 claimants in the several lawsuits were made sterile by DBCP" with the *Tellez* statement of decision, which does not include the oral finding.[4]

Plaintiffs cannot rely on alleged factual discrepancies between *Mejia* and *Tellez* as a basis for challenging the *Tellez* protective order or the findings set forth in the *Tellez* statement of decision. Factual findings made by the trial court in *Mejia* may not be challenged in this appeal. Plaintiffs raise no sufficiency of the evidence challenge with regard to the relevant findings in this case that they too committed a fraud on the court by submitting false testimony, fraudulent declarations and work certificates, and fraudulent laboratory reports as part of a fraudulent scheme orchestrated by their attorneys Dominguez and Ordeñana and are deemed to have waived such challenge. (*Arechiga v Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 571-572.)

Alleged discrepancies between the trial court's oral pronouncements at the OSC hearing in the instant case and its written statement of decision are not a valid basis for challenging the trial court's factual findings or legal conclusions. "'[T]he reasons of a

---

**4**    Plaintiffs purport to challenge other allegedly erroneous factual findings made in *Mejia*, including the existence of a conspiracy among lawyers and corrupt judges in Nicaragua to bring fraudulent claims, multiple meetings among the conspirators to manufacture evidence, and a group of eight individuals responsible for threatening and intimidating witnesses who could attest to the fraud. For reasons discussed, we do not consider these challenges.

12

trial court . . . do not in a strict sense constitute a part of the record on appeal . . . .' [Citation.] There are instances where a court's comments may be 'valuable in illustrating the trial judge's theory but . . . they *may never be used to impeach the order or judgment*. [Citation.]' [Citation.]" (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646.) "Neither an oral expression nor a written opinion can restrict the power of the judge to declare his [or her] final conclusion in his [or her] findings of fact and conclusions of law. [Citation.] The findings and conclusions constitute the final decision of the court and an oral or written opinion cannot be resorted to for the purpose of impeaching or gain-saying the findings and judgment. [Citation.]" (*Buckhantz v. R. G. Hamilton & Co.* (1945) 71 Cal.App.2d 777, 781.) "Nor can the statement of decision be impeached by the court's oral comments from the bench. [Citations.]" (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 767.) Plaintiffs may not rely on the trial court's comments at the hearing on defendants' petition, or on the court's comments and findings in the *Mejia* case, as the basis for challenging the factual findings in the statement of decision.

### 2. Credibility of John Doe witnesses

Plaintiffs also challenge the trial court's determination that the testimony of the John Doe witnesses was credible. A reviewing court does not reweigh the evidence or reconsider credibility determinations. (*Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 107.) It was within the exclusive province of the trial court, as the trier of fact, to determine credibility. (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823.) "[T]he testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence, and we must defer to the trial court's determination that these witnesses were credible. [Citations.]" (*Estate of Odian* (2006) 145 Cal.App.4th 152, 168.)

Plaintiffs' attempts to reargue selected portions of the evidence in an effort to induce this court to make different findings is not a valid ground for overturning the trial court's order. On substantial evidence the trial court found that plaintiffs and their counsel committed a fraud on the court by presenting false evidence and testimony. A reviewing court is powerless to modify such findings. (*Sketchley v. Lipkin* (1950) 99

Cal.App.2d 849, 855.) "It is the function of the trial court not only to determine the weight and credibility of evidence [citation] but where there is a conflict in the evidence the trial court's finding is final. [Citation.]" (*Ibid.*)

### B. Alleged due process violations

#### 1. Nondisclosure of witness identities

Plaintiffs claim the protective order prohibiting disclosure of the John Doe witness identities violated their due process rights by preventing investigation into the witnesses' potential motivations to distort or fabricate evidence and by preventing any effective attempt to verify the substance of the witnesses' testimony and that there were no safeguards to prevent the taint of unsubstantiated allegations of fraud to permeate the entire proceedings. These same arguments were rejected by the California Supreme Court in *People v. Valdez* (2012) 55 Cal.4th 82 (*Valdez*), which involved a protective order very similar to the one at issue here.

The protective order in *Valdez* precluded defense counsel from learning the names of several witnesses until shortly before trial; prohibited defense counsel from disclosing the witnesses' identities to the defendant without first obtaining a court order; and barred defense counsel and the defendant from ever knowing the addresses or telephone numbers of the witnesses. (*Valdez, supra*, 55 Cal.4th at pp. 102, 107-108.) The defendant argued that the protective order "violated his constitutional rights to due process, to a fair trial, to confront witnesses and to a reliable determination of death judgment." (*Id.* at p. 105.) Specifically, the defendant argued that allowing the prosecution to withhold the witnesses' identities until their testimony at trial denied him "'an adequate opportunity to investigate and prepare his defense,'" "prevented him from determining whether [the witnesses] harbored bias or prejudice against him or other defendants, [and] whether they had reason to testify falsely" and prevented him "from adequately investigating grounds for impeachment, i.e., '"their reputation[s] for truthfulness or dishonesty . . . and other motives to fabricate, such as revenge or reduction of their own charges."'" (*Id.* at p. 108.)

14

The California Supreme Court rejected these arguments, concluding that "[a]s a legal matter, governing precedent does not support defendant's constitutional claim." The court then cited *Weatherford v. Bursey* (1977) 429 U.S. 545, in which the United States Supreme Court "rejected the argument that the lack of advance disclosure deprived the defendant 'of the opportunity to investigate [the witness] in preparation for possible impeachment on cross-examination.'" (*Valdez, supra*, 55 Cal.4th at p. 110, quoting *Weatherford, supra*, at p. 561.) Other cases are in accord. (See *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1072 [recognizing that protective order "could be fashioned which would allow John Doe's deposition to proceed and documents produced on matters relevant to the issues in the litigation but in a manner that maintains the confidentiality of John Doe's identity and that of his family"]; *People v. Lopez* (1963) 60 Cal.2d 223, 246-247 [protective order authorizing prosecution to withhold identities of witnesses until 24 hours before they testified did not deprive defendant of a fair trial]; *Morgan v. Bennett* (2d Cir. 2000) 204 F.3d 360, 368 ["valid concerns for the safety of witnesses and their families and for the integrity of the judicial process may justify a limited restriction on a defendant's access to information known to his attorney"] *United States v. Ramos-Cruz* (4th Cir. 2012) 667 F.3d 487, 500-501 [trial court order allowing witnesses to testify without revealing their names, home and work addresses, and places of birth did not violate Sixth Amendment right to confrontation].) A protective order allowing disclosure of witness information to an attorney, but prohibiting the attorney from revealing that information to others, including the client, does not necessarily impinge on the due process right to a fair trial.

The Supreme Court in *Valdez* went on to find several reasons why the challenged protective order did not violate the defendant's constitutional rights. The court first found that the trial court had accorded defense counsel pretrial access to information about the witnesses, such as their prior convictions. The trial court had also emphasized that the order was "'a work in progress as this case progresses'" and had invited defense counsel to seek amendment of the protective order as necessary. (*Valdez, supra*, 55 Cal.4th at p. 110.) Despite this offer, defense counsel never offered a viable alternative.

15

Finally, the Supreme Court found that the protective order "did not in fact 'significantly impair' defendant's 'ability to investigate or effectively cross-examine' the witnesses," as defense counsel had engaged in "lengthy cross-examination" of witnesses during the trial. (*Id.* at pp. 111-112.)

All of the above reasons apply equally in the instant case. As in *Valdez*, the trial court in this case took steps to mitigate the impact of restricting information concerning the identities of the protected witnesses by ordering Dole to disclose its work product notes of witness interviews and by allowing plaintiffs' counsel the opportunity to prepare for and conduct cross-examination of those witnesses. The Miller Axline attorneys thus not only knew the identity of the John Doe witnesses before their depositions, they also had, in advance of each deposition, Dole's work product investigator and attorney reports from interviews of the deponent and all exhibits Dole planned to use during the depositions. Here, as in *Valdez*, the trial court extended multiple invitations to Miller Axline and to plaintiffs' current counsel, Condie, to raise any problems, concerns, or issues they were encountering or any proposed modifications of the protective order. Counsel never raised any problems, issues, or concerns, nor did they suggest any specific modifications to the protective order. Finally, Miller Axline, like the defendant's counsel in *Valdez*, had ample opportunity to, and did in fact cross-examine at length the John Doe witnesses who appeared for deposition. All of these measures functioned as an adequate and appropriate safeguard to the integrity of the proceedings. For the same reasons stated by the California Supreme Court in *Valdez*, the protective orders issued by the trial court in the instant case did not violate plaintiffs' due process right to a fair trial.

### 2. Limiting disclosure and cross-examination of witnesses

The trial court's order limiting disclosure of John Doe witness information and limiting cross-examination of those witnesses to the non-Spanish-speaking attorneys at Miller Axline did not deprive plaintiffs of their due process right to investigate the fraud allegations.

All of plaintiffs' attorneys, including Dominguez and Ordeñana, were able to investigate the fraud allegations without restriction for a substantial period of time.

16

Plaintiffs and their attorneys were made aware of the fraud allegations and the substance of Witness X's testimony when Dole filed its motion for a new trial in *Tellez* in January 2008. The *Mejia* protective order was not issued until October 6, 2008. During the nearly nine-month period between the *Tellez* new trial motion and issuance of the *Mejia* protective order, all of plaintiffs' attorneys -- Miller Axline, Dominguez, and Ordeñana -- were able to jointly investigate the fraud allegations without restriction.

After entry of the *Mejia* protective order, the trial court suggested to the Miller Axline attorneys that they consider hiring an independent Spanish-speaking investigator. Miller Axline eventually did so, and the trial court ruled that upon signing the protective order, the investigator "will be allowed access to all protected information." Plaintiffs' attorneys at Miller Axline, along with their Spanish-speaking investigator, had full access to the protected witness information.

In addition to information concerning the identities of the John Doe witnesses, attorneys at Miller Axline were also provided with Dole's attorney work product notes, reports, and memoranda of witness interviews, as well as advance copies of all exhibits Dole intended to use during the John Doe witness depositions. There is nothing in the record to indicate that the Miller Axline attorneys, who had successfully tried the *Tellez* case and obtained a jury verdict in plaintiffs' favor, were incapable of preparing for the John Doe depositions or cross-examining the John Doe witnesses without assistance from Dominguez or Ordeñana. The order prohibiting disclosure of witness information to Dominguez and Ordeñana and limiting disclosure and cross-examination of witnesses to Miller Axline was not an abuse of discretion.

### 3. **Admission of *Mejia* John Doe testimony**

Plaintiffs challenge the trial court's admission of the John Doe depositions taken in *Mejia* on the ground that they were denied the opportunity to effectively cross-examine those witnesses because of the restrictions imposed by the *Mejia* protective order.

Former testimony of a witness who is unavailable is admissible under Evidence Code section 1292 if "the party to the action or proceeding in which the former testimony was given had the right and opportunity to cross-examine the declarant with an interest or

17

motive similar to that which the party against whom the testimony is offered has at the hearing." (Evid. Code, § 1292, subd. (a).) "Where a witness is unavailable to testify, the defendant's due process rights are sufficiently protected by the use of the witness's testimony from a former action or proceeding, provided the defendant had the right and opportunity to cross-examine the witness in that proceeding with an interest and motive similar to that which he has in the present proceeding. [Citations.] Indeed, '[i]f the [defendant] had an adequate opportunity for cross-examination in an earlier proceeding, the confrontation clause may be satisfied even absent physical confrontation at time of trial' even where there has been no showing that the witness is unavailable. [Citations.]" (*In re Elizabeth T.* (1992) 9 Cal.App.4th 636, 640-641.) A trial court's ruling under Evidence Code section 1292 is reviewed for abuse of discretion. (*Aguayo v. Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 1032, 1038.)

The record discloses no abuse of discretion by the trial court. Miller Axline was present during the depositions of John Doe witnesses 1 through 19 and had the opportunity to cross-examine those witnesses at length. Dole also offered to make John Doe witnesses 20 through 27 available for deposition, but Miller Axline declined to do so because of increasing concerns about witness safety, as well as the safety of their own attorneys. These concerns caused the parties to stipulate that sworn declarations by John Does 20 through 27 would be admissible without cross-examination, as reflected in the reporter's transcript for the March 6, 2009 hearing at which these issues were discussed:

> "[Mr. Axline]: "I share the Court's concerns with safety, and it does seem to me that if Dole wants to get additional testimony, that declarations might be the safest way to do it. . . . I do think that I have now seen the escalation down there, and with specific death threats being apparently to John Doe witnesses that really is a concern on our side as well."

> "[The trial court]: "Declarations are fine. . . . I just want to make sure that there is due process on all sides here, and if there's discovery that Mr. Axline believes should be taken regarding these people, then we need to work that out."

18

Plaintiffs did not seek to depose John Doe witnesses 20 through 27, nor were they precluded from doing so.

We do not address plaintiffs' arguments that John Doe witnesses 9, 13, 17, and 18 committed perjury, and that the trial court's credibility determinations were flawed. Under the standard applicable to our review of the trial court's factual findings, we do not reweigh the evidence or attempt to evaluate the credibility of witnesses; those are functions delegated to the trial court. (*Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514-515.)

### 4. Deposing John Doe witnesses 17 and 18

Plaintiffs contend the trial court erred by denying their request to depose John Doe witnesses 17 and 18[5] -- both of whom had previously been deposed by Dole and cross-examined by Miller Axline in *Mejia*. Although the trial court initially denied plaintiffs' request to redepose John Does 17 and 18, it subsequently reconsidered that ruling and ordered those depositions to proceed. The court countermanded its order only after evidence of escalating threats against those witnesses came to light.

Dole presented evidence that Ordeñana had publicly identified certain John Doe witnesses by name, including John Doe witnesses 17 and 18, and berated and threatened them in the Nicaraguan media. In a public radio broadcast, Ordeñana described the witnesses as "rats" and cautioned them to "be careful" because the situation was "dangerous." The trial court found Ordeñana's actions to be evidence of "serious witness tampering by plaintiffs' agents" that "precludes further discovery from taking place." The court accorded plaintiffs the opportunity to challenge the evidence and the factual underpinnings of her order denying their request for further discovery: "If plaintiffs wish

---

**5**    Plaintiffs also claim the trial court erred by denying a purported request to depose John Doe 1. The record, however, contains no motion by plaintiffs to depose John Doe 1 (who was previously deposed in *Mejia* as John Doe 2) and no order denying such motion. The same is true with respect to plaintiffs' claim that the trial court precluded them from contacting attorney Thomas Girardi, whom John Doe witness 17 identified during deposition as a participant in the Montserrat meeting. Plaintiffs never made any formal motion to interview Girardi or to share protected information with him, nor is there any order preventing plaintiffs from contacting or interviewing Girardi.

19

to respond to [the] new evidence [of threats] they may do so in the context of further supporting their motion for discovery." The court directed plaintiffs to address "[e]ither the foundation or what the documents say, the radio broadcasts, or that you think that somehow this doesn't apply to and doesn't suggest an increased threat of harm to the witnesses." Plaintiffs did not do so, and the trial court denied their request to depose John Does 17 and 18 because of concerns for witness safety. That denial was not an abuse of discretion.

### 5. Production of *Mejia* email communications

Plaintiffs contend they were prejudiced by the trial court's refusal to grant their motions to compel Dole to produce email communications in *Mejia* between the parties and the court. The record discloses no abuse of discretion.

When plaintiffs first raised the issue, the trial court stated that it saw no basis for compelling production of email communications that were not part of the *Tellez* record but that pertained to another action in which final judgment had been entered and from which no appeal had been taken. The trial court further stated, based on its own familiarity with the *Mejia* litigation, that the emails were "not relevant" to the instant case and that any substantive emails were summarized in the *Mejia* notices of rulings: "I personally checked all notices of ruling that arose from those email communications. And the notices of ruling adequately and accurately reflected what was communicated during the emails." The trial court's denial of plaintiffs' request to produce the *Mejia* emails was not an abuse of discretion.

### 6. Investigating alleged bribery by Dole

Plaintiffs claim the trial court precluded them from investigating bribes allegedly paid by Dole to John Doe witnesses 17 and 18, who were relocated to Costa Rica with the trial court's approval and agreement from Miller Axline after both witnesses were threatened with physical harm. Plaintiffs contend the court abused its discretion by excusing Dole "from the responsibility to produce concrete evidence" and from disclosing financial records of an account that had been used to pay relocation expenses for those witnesses. The record discloses no abuse of discretion.

20

The trial court found that the relocation of John Does 17 and 18 to Costa Rica was necessary after John Doe 17 received a written death threat at his home in Nicaragua and John Doe 18 was jailed and released in Nicaragua without explanation. Plaintiffs' attorneys at Miller Axline consented to the relocation of these witnesses at Dole's expense and agreed on the record that "[t]his effort on behalf of Dole is to protect the witnesses and will not be construed at a later point as some sort of bribe."

In the ensuing weeks, additional threats were made against Dole's investigators and against John Does 17 and 18 when they returned to Nicaragua for a short stay. Plaintiffs' counsel Axline at this time also expressed concerns about the conditions in Nicaragua, stating, "I for example, would not feel safe at this point traveling to Nicaragua to meet with [my] clients." Because of the deteriorating situation in Nicaragua, the trial court approved an extension of the temporary relocation of John Does 17 and 18 and ultimately approved a permanent relocation of both witnesses, including offers of employment and housing provided by Dole.

Dole provided spreadsheets showing the relocation expenses it incurred, as well as receipts for those expenses, in two separate submissions. On June 29, 2009, Dole submitted spreadsheets for expenses incurred though May 2009 during *Mejia*, and on April 20, 2010, it submitted spreadsheets for expenses incurred in the instant *Tellez* case through March 2010. The trial court found that the amounts Dole paid were within parameters approved by the court and that Dole had accounted for all of the relocation expenses.

When Dole explained in April 2010 that it had detected and corrected an accounting error in the June 2009 submission (three $1,500 per month stipends to the two witnesses for food and personal expenses had been omitted from that submission), plaintiffs filed a motion seeking leave of court to investigate the monthly stipend paid by Dole. In response, Dole submitted five declarations explaining how the oversight had occurred and how it was detected and corrected. The trial court also ordered Dole to respond to written discovery from plaintiffs and to provide more evidence concerning the relocation and employment of John Doe witnesses 17 and 18. Pursuant to that order,

21

Dole produced hundreds of pages of documents, responded to 12 interrogatories and 17 document requests, and submitted nine declarations explaining its accounting of the relocation expenses. Plaintiffs requested additional discovery, including depositions of John Does 17 and 18, and business records and expense reports from third party investigators Dole had retained to assist in the relocation effort. The trial court denied this request based on a number of factors, including the escalating threat of violence against the witnesses, and declarations by Dole that it had attempted, unsuccessfully, to obtain the requested business records from the third party investigators. The trial court found that Dole provided sufficient evidence to account for all relocation expenses and that the relocation efforts to protect and to subsequently employ John Does 17 and 18 did not constitute bribery. Substantial evidence supports the trial court's findings, and its denial of plaintiffs' discovery requests was not an abuse of discretion.

## III. The trial court's ruling on the petitions was not an abuse of discretion

Plaintiffs challenge the trial court's findings on only two of the five requirements[6] for *coram vobis* relief -- whether the new evidence would have made probable or compelled a different result at trial, and whether the petitioners acted diligently.

### A. *Dole's diligence*

Substantial evidence supports the trial court's finding that Dole acted diligently to uncover the fraud. To do so, Dole had to contend with claimants who had no documentary evidence of employment at any Dole-contracted banana farm, hostility toward its investigators, and witness intimidation and tampering by Ordeñana and others. Dole's investigators, Francisco Valadez and Luis Madrigal, both of whom the trial court found to be credible, testified that most witnesses were afraid to come forward with

---

[6] As discussed, a writ of error *coram vobis* may issue when five factors are present: (1) no other remedy is available to consider the new evidence; (2) the new evidence would compel or make probable a different result in the trial court; (3) the petitioner acted diligently, but through no fault of its own, did not have the evidence at the time of trial; (4) the evidence concerns an issue not adjudicated at trial; and (5) the evidence was not presented earlier because of extrinsic fraud. (*Rachel M., supra*, 113 Cal.App.4th at p. 1296.)

information about the plaintiffs in this case and in *Mejia.* Valadez and Madrigal further testified that the threatening and intimidating atmosphere in Nicaragua dating back to 2004 significantly interfered with their ability to conduct discovery in preparation for Dole's defense. Notwithstanding these difficulties, Dole's investigators conducted 273 interviews of 239 witnesses potentially relevant to this case and sought to interview numerous other witnesses who were unavailable or who refused to be interviewed.

### B. Different result

The same bench officer conducted the *coram vobis* proceedings that are the subject of the instant appeal and also presided over the *Tellez* trial in 2007. She was thus uniquely qualified to determine whether the fraud evidence presented in the *coram vobis* proceedings would have made probable or compelled a different result at trial. Justice Chaney expressly found that the evidence of fraud would have "compel[led] the trial court to grant a new trial or dismiss the lawsuit on the ground of misconduct" because "[b]efore trial in *Tellez* and continuing on beyond the *Mejia* proceedings, plaintiffs' counsel and agents caused witnesses and potential witnesses to fear for their safety if they cooperated with defendants' investigative efforts." Justice Chaney further found that "[t]he misconduct has been so widespread and pervasive that it is now impossible to determine, in accordance with the fair application of law, what the truth is and who should prevail on the merits in this controversy."

Plaintiffs ignore these findings and argue that the inquiry should be limited to two factual issues: Did plaintiffs work on a Dole banana farm, and did they suffer from azoospermia or oligospermia? Even limiting the fraud evidence to these two narrow factual issues, there was ample evidence to support the trial court's finding that the evidence of fraud would have compelled a different result. Plaintiffs' claims were themselves found to be fraudulent. The trial court found that each of the *Tellez* plaintiffs was involved in the fraud, and there is substantial evidence in the record to support those findings.

The trial court found that plaintiffs Jose Anastacio Rojas Laguna and Claudio Gonzalez were never banana workers and were not exposed to DBCP. During their

23

respective depositions, neither Laguna nor Gonzalez could answer questions about basic information concerning the banana farm at which they purportedly worked, such as the size of the farm or the existence or location of buildings. Both men testified that they had been recruited by a "captain" working for Dominguez to serve as plaintiffs in *Tellez*, and both produced a forged work certificate signed by an individual who had never worked on a banana farm.

The trial court found that the claims of plaintiffs Jose Uriel Mendoza Gutierrez, Matilde Jose Lopez Mercado, and Julio Cesar Calero Gonzalez were the product of a fraudulent scheme. John Doe witnesses testified that the signatories on the work certificates produced by Gonzalez and Gutierrez were paid to sign them in blank. Mercado testified that one of his lab reports was "false." Gonzalez testified the he had never seen his sworn interrogatory responses and did not recall using his fingerprint to verify them. The trial court further found that all three of these plaintiffs gave testimony that bore indicia of having been coached.

Substantial evidence supports the trial court's finding that the *Tellez* plaintiffs were complicit in a fraud on the court. The trial court's order granting the petitions for *coram vobis* relief accordingly was not an abuse of discretion.

## IV. Plaintiffs' judicial bias claim

Plaintiffs' brief is peppered with invective and disparaging remarks directed at the trial court in an apparent effort to persuade this court to set aside the judgment on the ground of judicial bias. Plaintiffs failed to raise any objection premised on judicial bias in the proceedings below and cannot do so for the first time in this appeal. (*Tri Counties Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1338; *Roth v. Parker* (1997) 57 Cal.App.4th 542, 547-548.)

**DISPOSITION**

The order granting the petitions for *coram vobis* relief, vacating the judgment, and dismissing this case with prejudice is affirmed.[7]  Defendants are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

---

[7]     Because we affirm the order granting the petitions for writ of error *coram vobis*, we need not address defendants' argument that the *Tellez* judgment could also have been vacated, as an alternative to *coram vobis* relief, based on the inherent power of the court to set aside a judgment obtained through a fraud upon the court.